**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TARGUS INTERNATIONAL LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-464-RGA |
| | ) | |
| VICTORINOX SWISS ARMY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**REPORT AND RECOMMENDATION**</u>

In this patent infringement action filed by Plaintiff Targus International LLC ("Plaintiff"

or "Targus") against Defendant Victorinox Swiss Army, Inc. ("Defendant" or "Victorinox"),

pending is Targus' motion to dismiss Victorinox's Counterclaims III and IV and to strike

Victorinox's third affirmative defense (the "Motion"), pursuant to Federal Rules of Civil

Procedure 12(b)(6) and 12(f).  (D.I. 16)  For the reasons set out below, the Court recommends

that Targus' Motion be DENIED.

**I.      BACKGROUND**

Targus filed its Complaint on April 2, 2020, in which it alleges that Victorinox infringes

Targus' United States Patent No. 8,567,578 (the "'578 patent").  (D.I. 1 & ex. A)[1]  The '578

patent describes and claims checkpoint-friendly computer cases that allow travelers to pass

through airport security without removing laptops from their cases.  ('578 patent)  On June 8,

2020, Victorinox filed its Answer and Counterclaims to Targus' Complaint ("Answer").  (D.I.

11)  Victorinox's Counterclaims III and IV and its third affirmative defense ("Third Defense")

are all found in the Answer.

---

[1]      The '578 patent is attached as Exhibit A to Targus' Complaint.  (D.I. 1, ex. A)
Further citation shall simply be to the "'578 patent."

Counterclaim III seeks a declaratory judgment that the '578 patent is unenforceable based on the doctrines of inequitable conduct and unclean hands, while Counterclaim IV alleges *Walker Process* fraud and attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2 ("Section 2").  (*Id.* at 15-26)  The Third Defense asserts that, for the same reasons set out in Counterclaim III, Targus' claims are barred because the '578 patent is unenforceable.  (*Id.* at 9) To the extent that certain additional facts relating to Counterclaims III and IV and the Third Defense are relevant to resolution of the Motion, they will be set out for ease of reference in Section III below.

Targus filed the instant Motion on June 26, 2020.  (D.I. 16)  Briefing on the Motion, which included Victorinox's filing of a notice of supplemental authority ("notice") pursuant to D. Del. LR 7.1.2(b) ("Rule 7.1.2(b)"), was completed on November 4, 2020.  (D.I. 59)[2]  The Motion has been referred to the Court for resolution by United States District Judge Richard G. Andrews.  (D.I. 38)

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss Under Rule 12(b)(6)

As noted above, Victorinox's Counterclaim IV alleges *Walker Process* fraud and attempted monopolization.  While the *Walker Process* fraud allegations are subject to the pleading requirements of Federal Rule of Civil Procedure 9(b) (which are further discussed below), Victorinox's allegations regarding the necessary elements of an antitrust violation must

---

[2]    Subsequent to Victorinox's filing of the notice, Plaintiff submitted a "response" to the notice, which it asserted was filed "pursuant to" Rule 7.1.2(b).  (D.I. 61 at 1)  In fact, Rule 7.1.2(b) provides for no such thing.  While Rule 7.1.2(b) allows a party to file a notice of supplemental authority, it does not provide for responses or replies to a notice of supplemental authority; instead, if a party wishes to file a "response" to a notice, it needs to seek leave of Court.  Plaintiff did not do so here, and so its "response" is STRICKEN, as is Victorinox's subsequent reply, (D.I. 62).

meet the requirements of Federal Rule of Civil Procedure 8 and the *Twombly/Iqbal* pleading standard. *See Avnet, Inc. v. Motio, Inc.*, Case No. 12 C 2100, 2015 WL 425442, at *4 (N.D. Ill. Jan. 30, 2015); *FutureLogic, Inc. v. TransAct Techs., Inc.*, Case No. CV 05-03754 MMM (CTx), 2007 WL 9700696, at *7, *15-17 (C.D. Cal. Oct. 30, 2007). With regard to the latter pleading standard, when presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210-11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In assessing the plausibility of a claim, the court must "'construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

**B.      Pleading Inequitable Conduct Under Rule 9(b)**

Victorinox's challenged inequitable conduct allegations are relevant to Counterclaim III, the Third Defense, and they also are offered to meet the *Walker Process* fraud element of Counterclaim IV. An individual associated with the filing and prosecution of a patent application commits inequitable conduct when he or she: (1) makes an affirmative misrepresentation of a material fact, fails to disclose material information or submits false material information to the United States Patent and Trademark Office ("PTO"); (2) with the specific intent to deceive the PTO. *Star Sci., Inc v. R.J. Reynolds Tobacco Co*., 537 F.3d 1357, 1365 (Fed. Cir. 2008); *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 321-22 (D. Del.

2013).  A claim of patent unenforceability premised upon inequitable conduct is a claim sounding in fraud.  *Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 306 (D. Del. 2013).  Under Rule 9(b), fraud is a clear exception to the otherwise broad notice-pleading standards.  *Id.*  A party alleging unenforceability, therefore, must plead with particularity those facts which support the claim that the patent holder acted fraudulently before the PTO.  *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1326 (Fed. Cir. 2009); *Senju*, 921 F. Supp. 2d at 306.  Additional legal requirements regarding the pleading of inequitable conduct are set out in Section III.A below.

C.    **Motion to Strike Under Rule 12(f)**

Victorinox has asserted inequitable conduct not only as a counterclaim but also as an affirmative defense (i.e., via the Third Defense).  Rule 12(b)(6) does not offer a mechanism for dismissing an affirmative defense, and instead refers only to "claim[s]."  Fed. R. Civ. P. 12(b)(6).  However, pursuant to Rule 12(f), the Court "may strike from a pleading an insufficient defense[.]"  Fed. R. Civ. P. 12(f).  When ruling on a motion to strike, the Court must construe all facts in favor of the non-moving party and deny the motion if the defense is sufficient under law.  *Senju*, 921 F. Supp. 2d at 301.  Further, a court should not grant a motion to strike unless the insufficiency of the defense is clearly apparent.  *Id*.

Just as a claim for inequitable conduct must meet the heightened pleading requirements of Rule 9(b), a defendant is also required to plead this affirmative defense with particularity under that Rule.  *St. Jude Med., Cardiology Div., Inc. v. Volcano Corp*., Civil Action No. 12-441-RGA, 2014 WL 2622240, at *1 n.1 (D. Del. June 11, 2014); *Senju*, 921 F. Supp. 2d at 306.  As a result, Victorinox's Counterclaim III and Third Defense rise and fall together.  *Id*.

III.    **DISCUSSION**

Below, the Court will first assess Targus' arguments for dismissal of Counterclaim III and the Third Defense. Thereafter it will address Targus' arguments regarding Counterclaim IV.

### A.      Counterclaim III/Third Defense

When it comes to pleading inequitable conduct, the United States Court of Appeals for the Federal Circuit has further explained that:

> [T]o plead the "circumstances" of inequitable conduct with the requisite "particularity" under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO. Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

*Exergen Corp.*, 575 F.3d at 1328-29.[3]  With regard to the first prong relating to materiality, the party making the inequitable conduct claim must show that but for an omission or misrepresentation by the patent applicant, the PTO would not have allowed a patent claim to issue.  *Therasense, Inc v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291-92 (Fed. Cir. 2011). And with regard to the second prong relating to intent, "the claimant need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO." *Wyeth Holdings Corp. v. Sandoz, Inc.*, Civ. Action No. 09-955-LPS-CJB, 2012 WL 600715, at *7 (D. Del. Feb. 3, 2012) (emphasis in original); *see also Exergen Corp.*, 575 F.3d at 1328-29.

---

[3]      Federal Circuit law governs the question of whether a party has sufficiently pleaded a claim of inequitable conduct.  *Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007).

Targus asserts that Victorinox's inequitable conduct allegations should be dismissed due to Victorinox's failure to plead sufficient facts regarding both: (1) the materiality of any allegedly withheld information; and (2) Targus' specific intent to deceive the PTO. (D.I. 17 at 3) The Court will address these issues in turn.

### 1.    Materiality

The Court first takes up materiality. In Counterclaim III, Victorinox appears to allege that the patent's three named inventors and a prosecuting attorney withheld from the PTO two types of information that were material to the patentability of the patent-in-suit: (1) the "TSA RFI"[4]; and (2) information about Targus' "collaboration with the TSA[.]" (D.I. 26 at 7)

With regard to the TSA RFI, Victorinox alleges that in March 2008, the TSA announced plans to implement security procedures that would allow travelers to pass through airport security checkpoints without being required to remove laptop computers from their bags. (D.I. 11 at ¶ 27)[5] On March 3, 2008, the TSA published the TSA RFI itself, which is a set of guidelines and specifications for laptop bags that would be TSA compliant or checkpoint friendly; the TSA RFI provided "'illustrative examples of possible solutions'" for bag designs that would meet the TSA's requirements and would "'allow passengers to not remove their laptops from carry-on bags for security screening.'" (*Id.* at ¶¶ 28-29) Victorinox alleges that one exemplary solution disclosed in the TSA RFI was "'[a] bag that would open completely so that each side of the bag would lie horizontally on the x-ray belt [with o]ne side of the bag [] designed to hold the laptop and nothing else'" and that "'would contain the laptop in a separate

---

[4]    "TSA" is a reference to the Transportation Security Administration of the United States Department of Homeland Security. An "RFI" is a "Request for Information."

[5]    All citations to paragraphs in the Answer herein, unless otherwise noted, are to the portion of the pleading that contains the Counterclaims.

compartment from other equipment like chargers and cables [such that the] accessories would be in a separate compartment.'" (*Id*. at ¶ 29)

With regard to the latter type of information—i.e., the subsequent "collaboration" between Targus and the TSA—here Victorinox alleges that for "several months" after the TSA RFI issued, "TSA collaborated with laptop bag manufacturers, including Targus, to design and develop laptop bags that comply with TSA guidelines and specifications, such as: (1) a laptop-only section; (2) bag sections, including the laptop-only section, that each lie flat on an X-ray belt; (3) no straps, zippers, pockets, handles, or closures that interfere with an X-ray image of the laptop; and (4) no items packed in the laptop-only section such that an X-ray image of the laptop is interfered with." (*Id*. at ¶ 32) As part of these collaboration efforts, TSA: (1) allowed responders to the RFI to submit sample/prototype bags and designs to TSA so that TSA could evaluate whether the bags were TSA-compliant; and (2) established three airport sites where bag manufacturers, including Targus, made appointments to test bags and received direct feedback from TSA about how their bags could be modified to comply with the March 2008 guidelines. (*Id*. at ¶¶ 31, 33)

Targus' assertion is that in Counterclaim III, Victorinox has not sufficiently pleaded the "how" of an inequitable conduct claim regarding materiality, either as to the TSA RFI or Targus' alleged subsequent "collaboration" with TSA. (D.I. 17 at 3-7) Below, the Court need only address Victorinox's allegations as to the TSA RFI. In doing so, it concludes that those allegations sufficiently demonstrate the materiality of the non-disclosure of that document.[6]

---

[6] The Court is not certain that it understands how Plaintiff's "collaboration" efforts, standing alone (i.e., were they considered separate and apart from the allegations about the TSA RFI itself), are asserted to amount to information that was material to patentability (i.e., that but for the failure to disclose such "collaboration" efforts, the patent-in-suit would not have issued). (D.I. 36 at 3-4) Certainly, the Court understands how facts relating to those collaboration efforts

Targus asserts to the contrary that Victorinox has "failed to plead any facts that would establish that the TSA RFI is material prior art[.]" (D.I. 17 at 3)  But the Court does not see how that is so.  Claim 1 of the '578 patent (the claim referenced in Targus' Complaint), (D.I. 1 at ¶ 11), is to a bi-fold case that allows for convenient screening of a computer, and that requires, *inter alia*:  (1) a "first storage section," as well as a "second storage section" that is "configured to receive a computer" and that contains a pouch but is "configured without an additional pouch"; and (2) that the case can be disposed in an "unfolded configuration" such that "wherein in the unfolded configuration with the outer sides of both the first and second storage sections laid flat upon a same planar surface, an object in the first storage section is removed from interfering with a scanner positioned above and below the second storage section to enable uninhibited scanning of a computer in the second pouch of the second storage section." ('578 patent, col. 20:5-57)  Yet Victorinox alleges that the TSA RFI, issued on March 3, 2008, disclosed those very same limitations.  (D.I. 11 at ¶¶ 42-43, 45)  It also alleges that the inventors knew of the TSA RFI as of March 6, 2008, and that the prosecuting attorney knew of the document by at least the February 13, 2009 filing of the non-provisional application that led to the issuance of the '578 patent.  (*Id.* at ¶¶ 35, 40; *see also* '578 patent at 1)  And it alleges that the patentee added these same limitations, first disclosed in the TSA RFI, to the claims of what became the '578 patent—all in order to overcome the PTO Examiner's rejections as to patentability.  (D.I. 11 at ¶ 45)  Despite all of this, Targus allegedly never disclosed the TSA RFI

---

are relevant to *Targus' receipt of and non-disclosure of the TSA RFI*—i.e., the piece of asserted prior art that, had it been disclosed, would purportedly have led the Examiner to reject the patent. But the Court is less sure that it sees how Counterclaim III sufficiently explains why non-disclosed facts relating to the "collaboration" efforts themselves would *independently* give rise to an inequitable conduct claim.  In any event, because (as is set out further below) the Counterclaim sets out a plausible inequitable conduct claim due to the non-disclosure of the TSA RFI, the Court need not further address this issue.

to the PTO.  (*Id.*; *see also id.* at ¶ 44 ("But for [the inventors' and prosecuting attorneys'] failure

to disclose at least this material information to the [PTO], the '578 [p]atent would not have

issued."))  This is enough to plausibly demonstrate that the TSA RFI is a material piece of prior

art that should have been disclosed to the PTO, but was not.  *See Targus Int'l LLC v. Everki*

*USA*, Case No.:  8:20-cv-00641-JLS-DFM (C.D. Cal. Nov. 3, 2020) ("*Everki*") at 6 (*attached at*

D.I. 59) ("As for 'how' this information is material, Everki alleges that the applicants used

specific limitations disclosed by the RFI to amend their application and overcome the PTO's

denial and that, but-for use of the RFI's disclosures, the application would have been denied.

These facts are enough, at this stage, to allege that the patent examiner would have denied the

application if she knew that the claim limitations applicants added in the amendment process

were taken wholesale from prior art or that someone other than the named inventors

(specifically, the TSA) contributed to the claimed invention."); *cf. Targus Grp. Int'l, Inc. v.*

*CODi, Inc*., Case No.: SACV 15-00353-CJC(Ex), 2015 WL 12696220, at *2 (C.D. Cal. Sept. 17,

2015) ("It stands to reason that if the '578 [p]atent simply incorporates the TSA's previously

published specifications for compliant bags that existed prior to the patent application, the PTO

likely would have considered that publication as an example of prior art in its decision whether

to grant the '578 [p]atent.").

Targus additionally argues that Victorinox's allegations about the TSA RFI are

insufficient because Counterclaim III does not establish that the TSA RFI "qualif[ies] as prior

art[.]"  (D.I. 17 at 4)  Targus writes that "[i]f, for example, the inventors conceived of their

invention prior to March 3, 2008, the TSA RFI was not prior art[.]"  (*Id.*)  But Counterclaim III

does not allege that the inventors conceived of their invention prior to March 3, 2008.  Instead, it

alleges that the non-provisional application leading to the patent was filed nearly a year after the

issuance of the TSA RFI, on February 13, 2009.  (D.I. 11 at ¶ 35)  And the clear implication from Victorinox's allegations is that Targus did not invent what is claimed in the patent until on or about February 13, 2009, such that the TSA RFI would amount to prior art pursuant to the relevant version of 35 U.S.C. § 102.  (*Id*. at ¶¶ 35, 42)[7]  Accepting Victorinox's alleged facts as true, the TSA RFI would be prior art.

Targus also argues that, regardless of what is alleged by Victorinox, "a *far more plausible* interpretation" of all of the relevant facts is that "the inventors had already conceived of their invention [prior to March 3, 2008] and that the TSA RFI was not prior art to their invention." (D.I. 17 at 4 (emphasis in original))  Yet while that might be one possible or even plausible interpretation of the facts pleaded in Counterclaim, that does not mean that Victorinox's alternate interpretation of the facts is not plausible *too*.  *Cf. Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("A court ruling on [a Rule 12(b)(6) motion] may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."); *Deere & Co. v. AGCO Corp.*, Civil Action No. 18-827-CFC, 2019 WL 668492, at *5 (D. Del. Feb. 19, 2019) ("But the fact that an innocuous or even

_____

[7]     Counterclaim III does note that Plaintiff filed two provisional applications prior to the date of the filing of the February 13, 2009 non-provisional application.  (D.I. 11 at ¶ 35) These were filed on March 13, 2008 and May 15, 2008, respectively.  (D.I. 26 at 3; '578 patent at 1)  But though the patent itself purports to claim priority to the provisional applications, ('578 patent, col. 1:6-13), it is not clear from the record that the invention date was in fact on March 13, 2008 or May 15, 2008.  (D.I. 26 at 9 & n.1); *see also Everki* at 6-7.  And even if the invention date was March 13, 2008, for example (i.e., the date of the first provisional application), Counterclaim III pleads that the TSA RFI was publicly available and known to at least the three inventors prior to that date.  (D.I. 26 at 9); *see also Everki* at 7 ("Everki therefore alleges that Targus knew of the RFI *before* the earliest priority date Targus could claim [i.e., as of March 6, 2008]—at least on the current record before the Court—and has done more than enough to plead that the RFI is prior art.") (emphasis in original).

exculpatory inference can also plausibly be drawn from a complaint's alleged facts does not warrant dismissal"); *see also Everki* at 6.

For all of these reasons, Victorinox's inequitable conduct allegations plausibly describe a material piece of prior art that Targus did not disclose to the PTO.

## 2.    Intent to Deceive

The Court next turns to Targus' argument that Victorinox insufficiently pleaded specific intent. "Because direct evidence of [specific] intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290.

In Counterclaim III, Victorinox pleaded, *inter alia*, that: (1) the inventors and the prosecuting attorney knowingly withheld the TSA RFI from the PTO with specific intent to deceive; (2) the "TSA RFI issued seven days (7) prior to applicants' initial provisional patent application referenced in the '578 [p]atent"; and (3) "on information and belief [the TSA RFI] was the material impetus for the purported invention claimed in the '578 [p]atent in that it provided a 'standard' (as conceded by Targus) for allowing laptop computers to remain within bags during airport screening and provided examples of such bags that included material characteristics that were subsequently included by the '578 [p]atent applicants in claims and arguments to the PTO." (D.I. 11 at ¶ 47)

Considering this content, as well as the other allegations in Counterclaim III previously set out above, Victorinox has done enough. It alleged that before the date of invention, Targus obtained a piece of prior art from the TSA (i.e., the TSA RFI) that contained key elements of what ended up in the claims of the patent-in-suit. It alleged that Targus then went on to work with the TSA for months to try to develop a laptop bag that met the standards in the TSA RFI (standards that later ended up being reflected in Targus' patent claims). And it alleged that

despite this close connection between Targus, the TSA and what became the claimed invention, Targus never informed the PTO of the existence of the TSA RFI.  Taking these allegations as true, they plausibly suggest that Targus took this path because it intended to deceive the PTO about the existence of this assertedly key piece of prior art.  *See Everki* at 8 ("These alleged facts are sufficient, if true, to support a reasonable inference that Targus used information it learned from the TSA and the RFI in support of its application and that it intentionally withheld its reliance on those sources from the PTO, knowing that the information would jeopardize its application.").[8]

In light of the above, and keeping in mind that in "this district, an inequitable conduct claim is rarely disallowed at the pleading stage due to the failure to adequately allege scienter[,]" *Zadro Prods., Inc. v. SDI Techs., Inc.*, Case No. 17-1406 (WCB), 2019 WL 1100470, at *5 (D. Del. Mar. 8, 2019), the Court concludes that Victorinox's allegations as to specific intent are not wanting.

### 3.    Conclusion

---

[8]    Plaintiff points out that in paragraph 40 of Counterclaim III, Victorinox makes reference to the fact that in the non-provisional patent application that led to the issuance of the '578 patent, there are references to TSA "'screening policies'" and "'expedited procedures'" that "'allow screening'" of a case like that claimed in the patent.  (D.I. 17 at 8-9)  It suggests that in light of this disclosure, it is "more plausible that the TSA RFI was not material, and there was no deceptive intent[,]" because it is "implausible that an applicant attempting to hide TSA's contribution would refer to the TSA's screening procedures in the application itself."  (*Id.*)  But as the Court noted previously, whether such an inference is "more plausible" is not the test here; the test is whether *Victorinox's allegations* are plausible too.  Moreover, the Court agrees with Victorinox that these disclosures "do not indicate that the purported invention resulted from review of the TSA RFI[,]" which is the key thing that Victorinox is suggesting was hidden by Plaintiff's inventors and prosecuting attorney.  (D.I. 26 at 12); *see also Everki* at 8 (concluding the same and noting that "[n]othing in the '578 [p]atent hints that the RFI exists or that the TSA specifically collaborated in the design of the checkpoint[-]friendly bags.").

For the reasons set out above, the Court recommends that Targus' Motion be denied as to Counterclaim III and the Third Defense.

## B.        Counterclaim IV

Counterclaim IV alleges *Walker Process* fraud and attempted monopolization in violation of Section 2 of the Sherman Act.[9]  A patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves, *inter alia*, that "the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 [] (1965)[.]"  *Nobelpharma AB v. Implant Innovations, Inc*., 141 F.3d 1059, 1068 (Fed. Cir. 1998).  To establish antitrust liability under this theory, Victorinox must further show the other elements necessary to establish a Sherman Act attempted monopolization claim, *see TransWeb, LLC v. 3M Innovative Props. Co*., 812 F.3d 1295, 1306 (Fed. Cir. 2016); this, in turn, requires Victorinox to establish that:  "'the defendant [i.e., Targus] (1) had specific intent to monopolize the relevant market[;] (2) engaged in anti-competitive or exclusionary conduct[;] and (3) possessed sufficient market power to come dangerously close to success[,]'" *Sun Microsystems, Inc v. Versata Enters., Inc.*, 630 F. Supp. 2d 395, 403 (D. Del. 2009) (quoting *Barr Labs., Inc. v. Abbott Labs*., 978 F.2d 98, 112 (3d Cir. 1992)).

Thus, in order to sufficiently plead attempted monopolization as to Counterclaim IV, Victorinox must, *inter alia*, sufficiently allege the relevant market, "the 'outer boundaries' of which 'are determined by the reasonable interchangeability of use or the cross-elasticity of

---

[9]        District courts apply Federal Circuit law to the "fraudulently obtained" element of a *Walker Process* claim and their own regional Circuit's law to the pleading of the other elements of antitrust law.  *See, e.g., Nobelpharma AB v. Implant Innovations, Inc*., 141 F.3d 1059, 1067-68 (Fed. Cir. 1998); *see also* (D.I. 26 at 14-15 n.2).

demand between the product itself and substitutes for it.'"  *Id.* (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *see also United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (noting that the relevant product market consists of all products that are "reasonably interchangeable by consumers for the same purposes").  Moreover, with regard to the third attempted monopolization factor—i.e., whether Targus possessed sufficient market power to come dangerously close to success—a dangerous probability of monopolization may exist if Targus possesses a significant market share when it undertakes the challenged anticompetitive conduct.  *Barr Labs.*, 978 F.2d at 112.  But as to this factor, Victorinox cannot simply allege "market share alone[;]" threatened monopolization "requires something more, which may include 'the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand.'"  *Crossroads Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 141 (3d Cir. 1998) (quoting *Barr Labs.*, 978 F.2d at 112).

Targus challenges Victorinox's Counterclaim IV on the independent ground[10] that Victorinox failed to plausibly allege the third attempted monopolization factor:  whether Targus possessed sufficient market power to come dangerously close to success.  (D.I. 17 at 9-13)  More specifically, Targus argues that Counterclaim IV is insufficient because:  (1) "Victorinox's definition of the [relevant] market . . . has no facts pled to support it"; and (2) Victorinox's allegations regarding why Targus possessed sufficient market power to come dangerously close to monopolization are weak.  (*Id.* at 11-13)

---

[10]       The parties do not dispute that if the Court finds (as it has) that Victorinox has adequately pleaded inequitable conduct as to Counterclaim III and the Third Defense, it has also sufficiently pleaded the fraud component of a *Walker Process* claim.  *TransWeb*, 812 F.3d at 1307; (D.I. 26 at 14; D.I. 36 at 7).

As to the first issue, Victorinox's allegations sufficiently define the relevant market.  In

paragraph 60 of Counterclaim IV, Victorinox pleads that the product market at issue is

"checkpoint-friendly (TSA compliant) laptop bags and cases sold to end-user consumers."  (D.I.

11 at ¶ 60)  And paragraph 60 also provides at least some additional allegations meant to

articulate *why* the market is bounded in that way—facts that address the concepts of "reasonable

interchangeability of use" and "cross-elasticity of demand between the product itself and

substitutes for it":

> Checkpoint-friendly laptop bags and cases are purchased by
> consumers who wish to pass through airport security checkpoints
> without being required to remove their laptop computers from their
> bags.  For consumers, laptop bags and cases without a TSA
> compliant mechanism for a consumer to pass a security checkpoint
> without removing his or her laptop computer are not readily
> interchangeable with TSA compliant checkpoint-friendly laptop
> bags or cases.

(*Id.*)  These allegations, though surely cabined, at least provide the reader with some factual basis

to understand *why* consumers purchase checkpoint-friendly laptop bags (because they want to

pass through airport security more quickly) and *why* other laptop bags and cases that are not TSA

compliant are not readily interchangeable with or substitutable for checkpoint-friendly bags

(because if the consumer were carrying such a bag, she would be held up for longer periods of

time at airport security).  This is sufficient to plead the relevant market here.  *Cf. NRT Tech.*

*Corp. v. Everi Holdings Inc.*, C.A. No. 19-804-MN-JLH, 2020 WL 3403091, at *7 (D. Del. June

19, 2020) (concluding that the antitrust plaintiff had sufficiently alleged a "gaming-specific kiosk

market" because the complaint asserted that "gaming-specific kiosks differ from traditional

ATMs and are not reasonably interchangeable with ATMs" and that "casinos 'demand' self-

service kiosks because they cut down on labor costs and reduce the time it takes patrons to

access funds"); *Kickflip, Inc. v. Facebook, Inc.*, 999 F. Supp. 2d 677, 687 (D. Del. 2013)

(concluding that the plaintiff sufficiently alleged a "virtual currency services and social-game networks" market because the plaintiff pleaded that, at the time it filed the complaint, "the only way for developers to effectively monetize social games is through the use of virtual-currency services" such that "there are no substitutes") (internal quotation marks and citations omitted).[11]

As to the second issue (relating to the "dangerously close" factor), Victorinox alleges that Targus "currently controls a significant portion of [the relevant] market[,]" though Victorinox does not say anything more specific about exactly how much of the market it is talking about. (D.I. 11 at ¶ 66)[12]  Importantly, Victorinox's pleading also addresses some of the other considerations that relate to the "dangerously close" factor.  For example, it alleges that there are "significant barriers to entry" in the market, namely Targus' '578 patent itself, the presence of the TSA standard and the fact that there are "limited design options" for checkpoint-friendly laptop bags that meet that standard but that do not infringe the patent-in-suit.  (*Id.* at ¶ 62)  And Victorinox obviously pleaded facts about the "nature of the anti-competitive conduct":  i.e., Targus' alleged efforts to "fraudulently[]obtain[ the] claims of the '578 [p]atent[.]"  (*Id.*)  While not robust, the Court concludes that Victorinox has done just enough to plausibly assert that Targus had a dangerous probability of success regarding monopolization.  *Cf. Broadcom Corp. v.*

---

[11]    Targus argues to the contrary that Victorinox's allegations are wanting because it is "undisputed that there are other [non-TSA-compliant] laptop bags and cases on the market." (D.I. 17 at 12)  But even if that is so, the allegations here are that:  (1) only those bags that are *compliant with the TSA RFI* will be allowed to pass through airport security without requiring removal of a laptop; and (2) there are only a limited number of design options for *those types of bags*.  (D.I. 11 at ¶¶ 30, 47, 62)  So the fact that "other laptop bags and cases" exist that are not TSA compliant does not really affect the Court's analysis here.

[12]    This is not fatal though, as an antitrust plaintiff is not necessarily required to plead the precise percentage of market share the defendant holds in order to make out an attempted monopolization claim.  *See Fidelity Eatontown, LLC v. Excellency Enter., LLC*, Civil Action No. 3:16-cv-3899-BRM-LHG, 2017 WL 2691417, at *4 (D.N.J. June 22, 2017) (citing *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 319 (3d Cir. 2007)).

*Qualcomm Inc.*, 501 F.3d 297, 318 (3d Cir. 2007) (concluding that the antitrust plaintiff had pleaded sufficient facts to plausibly assert the third attempted monopolization factor, even though it "did not allege [the defendant's] market share" in the relevant market, because it otherwise pleaded facts about the defendant's assertedly wrongful licensing practices, why those practices had anti-competitive effects and had foreclosed the plaintiff's entry into the market, and how the defendant was rapidly expanding those anticompetitive practices in the market); *Carpenter Tech. Corp. v. Allegheny Techs., Inc.*, 646 F. Supp. 2d 726, 735 (E.D. Pa. July 16, 2009) (concluding that the complaint alleged sufficient facts to survive a motion to dismiss as to this factor, where the plaintiff pleaded that the defendant was "one of only a few" competitors and that defendant's enforcing "'fraudulently obtained' patents" put defendant in a "position to foreclose competition in the relevant market").

To be sure, Victorinox's allegations here could have been more fulsome. But the United States Court of Appeals for the Third Circuit has stated that the third attempted monopolization factor implicates a "'particularly fact-intensive inquiry'"; as such, the Third Circuit has cautioned that "[c]ourts typically should not resolve this question at the pleading stage 'unless it is clear on the face of the complaint that the dangerous probability standard cannot be met as a matter of law.'" *Broadcom Corp.*, 501 F.3d at 318 (certain internal quotation marks omitted). The Court takes that guidance to heart here, and thus recommends that the Motion should also be denied as to Counterclaim IV.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that the Motion be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the

loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x

924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website,

located at http://www.ded.uscourts.gov.

Dated:  December 10, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

18