## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TARGUS INTERNATIONAL LLC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 20-464-WCB-MPT |
| | § | |
| VICTORINOX SWISS ARMY, INC., | § | |
| | § | |
| *Defendant*. | § | |
| | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this patent infringement action, plaintiff Targus International LLC ("Targus") alleges that defendant Victorinox Swiss Army, Inc., ("Victorinox") infringes the claims of U.S. Patent No. 8,567,578 ("the '578 patent"). Both Targus and Victorinox have moved for summary judgment on various issues, and both have moved to exclude the testimony of certain experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Dkt. Nos. 242–43, 246–47. On March 23, 2023, I held oral argument regarding those motions. This order sets out my disposition of each motion.

### I.   <u>Background</u>

Targus and Victorinox are competitors that manufacture and sell briefcases and backpacks designed to hold computers as well as other items. Targus alleges that 15 different products sold by Victorinox infringe Targus's rights in the '578 patent.[1]

---

[1]  The accused products sold by Victorinox include five briefcases and ten backpacks. The briefcases are: Legacy 16" Double Gusset, Legacy 14.1" Double Gusset, Legacy 17" Slimcase, Sierra Slimcase, and Legacy 16" Triple Gusset. The backpacks are: Algorithm (also referred to as "Algorithm 972"), Algorithm USB (also referred to "Algorithm 256"), Buffer, Cyberwork,

The '578 patent is generally directed to "carrying cases that provide convenient security screening of an electronic device, such as a computer disposed within the carrying case." '578 patent, col. 1, ll. 18–20.  One problem with prior art carrying cases, the patent explains, is that persons using such cases would need to remove their electronic devices from the cases when traveling through airport security.  *Id.* at col. 2, ll. 16–30.  The purported advance of the '578 patent is to provide a bag that allows for an electronic device to remain "within the case or partially within the case while still enabling effective screening" of the device.  *Id.* at col. 2, ll. 30–32.

Claim 1 of the '578 patent is representative for purposes of the present motions.[2]  That claim recites as follows:

> 1.   A bi-fold case to allow for convenient security screening of a computer, comprising:
>
> a first storage section comprising a first outer side, a first inner side, a first proximal end, and a first distal end opposite the first proximal end, the first outer side, first inner side, first proximal end, and first distal end defining a first pouch with a first pouch opening and a first pouch fastener coupled to the first pouch opening and configured to only secure the first pouch opening, wherein the first outer and inner sides are configured to enable a scanning device to scan through the first outer and inner sides and scan an interior of the first pouch, wherein the first storage section further comprises a third pouch including a third pouch opening, independent of the first pouch opening, and a third fastener to only secure the third pouch opening; and
>
> a second storage section comprising a second outer side, a second inner side having a surface area approximately equal to a surface area of the first inner side, a second proximal end, and a second distal end opposite the second proximal end, the second storage section comprising,
>
> > a second pouch and the second storage section configured without an additional pouch, the second pouch configured to receive a computer, wherein the second storage section and the second outer and inner sides are configured to enable a scanning device to scan

Legacy, Odyssey Pro-Check, Pro-Check 15", Pro-Check 17", Skywalk Flyer, and Vysionpoint Pro.

[2]  Targus has also asserted claims 2, 17, and 44 of the '578 patent against Victorinox, but those claims do not differ from claim 1 in any way that is material to the present motions.

> through the second outer and inner sides and scan an interior of the second pouch and a computer disposed therein, and
>
> a second pouch fastener configured to substantially enclose only the second pouch and thereby retain a computer therein,
>
> the second storage section foldably joined at the second proximal end to the first proximal end of the first storage section such that the second proximal end and the first proximal end are coupled adjacent one another to form a hinge configured to enable a scanning device to scan through the hinge,
>
> wherein the first and second inner sides are disposed adjacent one another in the folded configuration and separated in an unfolded configuration,
>
> wherein the first and second distal ends are disposed adjacent one another in the folded configuration and separated from one another in the unfolded configuration,
>
> wherein in the unfolded configuration with the outer sides of both the first and second storage sections laid flat upon a same planar surface, an object in the first storage section is removed from interfering with a scanner positioned above and below the second storage section to enable uninhibited scanning of a computer in the second pouch of the second storage section.

'578 patent, cl. 1.

The cases described in claim 1 have two configurations, a "folded" configuration and an "unfolded" configuration. In the folded configuration, the briefcase or backpack is closed and suitable for being transported. *See id.* at col. 9, ll. 29–32; *id.* at Figs. 10A–10C. In the unfolded configuration, the briefcase or backpack is opened up so that the computer is visible and accessible when the bag is laid flat on a surface, such as an airport security scanner belt. *See id.* at col. 9, ll. 32–35; *id.* at Figs. 10D–10E.

## II.   <u>Legal Standard</u>

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the case of an issue on which the nonmoving party bears the burden of proof at trial, as is the case for each issue raised by the parties' summary judgment motions, the party seeking

summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986).  The burden on the nonmoving party in that situation can be satisfied "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up); *see also* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2727.1 (4th ed., April 2022 update).

Motions to exclude expert testimony are governed by Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert*.  The Advisory Committee on Evidence Rules has recently approved a clarifying amendment to Rule 702, which is set to take effect in December 2023.  Courts have begun applying the amended rule because the changes are "not substantive" and simply "clarify how the Rule was meant to be applied."  *In re Anderson*, No. 15-21681, 2023 WL 2229355, at *3 (Bankr. W.D. Tenn. Jan. 19, 2023); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 283–84 (4th Cir. 2021); *White v. City of Greensboro*, 586 F. Supp. 3d 466, 477 (M.D.N.C. 2022).  The amended version of Rule 702 recites as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if *the proponent has demonstrated by a preponderance of the evidence that*:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the *expert's opinion reflects a reliable application of* the principles and methods to the facts of the case.

Committee on Rules of Practice & Procedure, Standing Committee Agenda Book 891–92 (June 7, 2022), https://www.uscourts.gov/sites/default/files/2022-06_standing_committee_ agenda_book_final.pdf (amendments shown in italics). Thus, in ruling on a motion to exclude expert testimony, the court must find by a preponderance of the evidence that the expert's opinion "reflects a reliable application" of the principles and methods underlying the opinion. *See id.*; *Sardis*, 10 F.4th at 283–84.

### III.   Victorinox's Motions

Victorinox has moved for summary judgment that (1) various subsets of the accused products in this case do not satisfy at least one of four limitations of claim 1; (2) Targus has not adequately marked its products under 35 U.S.C. § 287(a); and (3) Targus has not established willful infringement prior to March 27, 2020. Victorinox also seeks to exclude testimony from Targus's experts regarding non-infringing alternatives under *Daubert* due to those experts' reliance on allegedly outdated materials.

#### A.   Non-Infringement

##### 1.   *"laid flat upon a same planar surface"*

Victorinox first argues that the Legacy and Skywalk Flyer backpacks do not infringe claim 1 because the outer sides of those backpacks do not "la[y] flat upon a same planar surface" when in an unfolded configuration, as claim 1 requires. In support of that argument, Victorinox points to testimony from its expert, Keith Poulson, who measured the angle between the first outer side and the second outer side of each bag when the bags were unfolded. Dkt. No. 248 at 17–18. He also measured the angle between the Legacy backpack and a flat surface on which it was laid and

determined that the angle was between 13 and 19 degrees, depending on whether there were objects in the first storage section of the backpack, and he measured the angle between the Skywalk Flyer backpack and the flat surface on which it was laid to be 8 degrees.  Dkt. No. 249-11, Exh. B ¶¶ 183–88, 244–46.  The parties' arguments on this issue essentially boil down to whether, in light of those angles, the backpacks lie sufficiently flat against a flat surface to satisfy the "laid flat upon a same planar surface" limitation of claim 1 of the '578 patent.

The dispute over that over that limitation turns on the proper construction of the term "laid flat."  During the claim construction proceedings in this case, the parties agreed that the phrase "the outer sides of both the first and second storage sections laid flat upon a same planar surface" would have its "plain and ordinary meaning," Dkt. No. 68, and the court adopted that construction, Dkt. No. 156 at 1.  It is now clear, however, that the parties do not agree on what constitutes the plain and ordinary meaning of the phrase "laid flat."  When the parties agree that an important term should be given its plain and ordinary meaning but do not agree on what that plain and ordinary meaning is, the court must construe the term.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–63 (Fed. Cir. 2008).

Victorinox argues that the plain and ordinary meaning of the phrase "laid flat" requires that the two outer sides of the case lie "horizontally on and in contact with the same planar surface."  Dkt. No. 248 at 15.  Although Victorinox's position is not made clear by the express language of its proposed construction, the expert report of Victorinox's expert, Mr. Poulson, makes clear that Victorinox intends to argue that the phrase requires mathematical precision, i.e., the two outer sides must be disposed at an angle of "0 degrees" to the planar surface on which the bag rests.  Dkt. No. 249-11, Exh. B ¶¶ 185, 188, 246.  Targus, by contrast, argues that the plain and ordinary

meaning of the phrase "laid flat" requires merely that the two outer sides be "substantially horizontal." Dkt. No. 244 at 34.

I conclude that the phrase "laid flat" does not require the two outer sides to be flat with mathematical precision, for three reasons. First, in one embodiment disclosed in the '578 patent, the unfolded bag is described as "flat," but the corresponding figure illustrates that the bag is not perfectly flat, i.e., the bag is not at an angle of exactly zero degrees with respect to the flat surface on which it rests. '578 patent, col. 10, ll. 13–16; *id.* at Figs. 10D–10E. As the Federal Circuit has explained, a claim construction that excludes a preferred embodiment is "rarely, if ever, correct." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) (citation omitted).

Second, and more fundamentally, no object in the physical world is perfectly flat, as a matter of mathematical precision. Even a sheet of paper, when resting on a table, which would unquestionably be characterized as "laid flat" on the table in the everyday sense of that phrase, contains microscopic elevations and depressions such that it is not perfectly flat in a mathematical sense; the same is true of the table on which the paper rests. Hence, Victorinox's "zero degrees" construction cannot be correct.

Victorinox did not offer a persuasive rebuttal to that proposition when I discussed the issue with counsel during a recent teleconference. Dkt. No. 245-1, Exh. 13, at 16:15–17:20. Thus, to accept Victorinox's proposed construction would mean that claim 1 would have an impossibly narrow scope—effectively, no scope at all.

Third, the language in claim 1 surrounding the "laid flat upon a flat planar surface" limitation makes clear that the key function of that limitation is to allow for uninhibited screening of a computer in the second storage section of the case. The relevant limitation of claim 1 recites, in full:

> wherein in the unfolded configuration with the outer sides of both the first and second storage sections laid upon a same planar surface, an object in the first storage section is removed from interfering with a scanner positioned above and below the second storage section to enable uninhibited scanning of a computer in the second pouch of the second storage section.

'578 patent, cl.1. That is, the key focus of the limitation is that "an object in the first storage section" does not interfere with the "scanning of a computer in the second pouch of the second storage section." *See id.* Small deviations from absolute flatness would not interfere with that objective of avoiding interference with the scanning function. For that reason as well, it would be inconsistent with the focus of the claim to conclude that the claim scope is limited to cases in which the outer sides of the bag are disposed at an angle of exactly zero degrees to the planar surface on which the bag rests. I therefore construe the "laid flat" limitation of claim 1 of the '578 patent to mean that the bag, when placed on a horizontal surface, must be disposed approximately horizontally along that surface.

Having rejected Victorinox's proposed narrow reading of the "laid flat" limitation, I conclude that a reasonable jury, using its common sense regarding the ordinary meaning of the term "flat" in accordance with the court's construction of that term, could find the accused cases to be "laid flat upon a same planar surface" when in the unfolded configuration. No further construction of the "laid flat upon a same planar surface" limitation is required at this point.

### 2. *"first outer side . . . defining a first pouch"*

Victorinox argues that the Sierra Slimcase, Legacy 17" Slimcase, Skywalk Flyer, Algorithm, Algorithm USB, and Odyssey Pro-Check bags do not infringe claim 1 because they do not comprise a "first outer side . . . defining a first pouch." Specifically, Victorinox argues that those bags do not infringe because the first outer side of the bag "does not, in any way, delineate a boundary of the 'first pouch.'" Dkt. No. 248 at 19. In Victorinox's view, the first pouch of each of those bags is defined by an "intermediate panel." *Id.* at 22.

Targus's expert, Stan Wada, identified what he viewed as the first outer side and first pouch for each of the accused bags in his expert report. Shown below are images of the Legacy 17" Slimcase (left) and the Algorithm backpack (middle and right), on which Mr. Wada highlighted the first outer side in orange and the first pouch in purple. The images of those two bags are generally representative of Mr. Wada's contentions with respect to all the accused bags.



Dkt. No. 249-14, Exh. C, at 7; *id.*, Exh. D, at 11, 16.

Victorinox's expert, Keith Poulson, offered the opinion in his rebuttal report that the first outer sides identified by Mr. Wada do not define the first pouches of their respective bags because an intermediate panel is disposed between the first outer side and the first pouch. Mr. Poulson illustrated that contention by providing annotated images of the accused bags in which he identified what he considered the intermediate panel. Shown below are those images of the Legacy 17" Slimcase (left) and the Algorithm backpack (right).

 

Dkt. No. 249-11, Exh. B ¶¶ 92, 125.

Along with its motion, Victorinox provided samples of the accused bags to the court for review, and the court has examined those bags closely.  Dkt. No. 249-1, Exhs. 1–6.  Each of the six bags that Victorinox focuses on with respect to this issue has at least one pouch on the front of the bag, i.e., on the outer surface of what Mr. Wada identified as the first outer side.[3]  Such pouches are referred to elsewhere in Mr. Wada's report as "third pouches." *See, e.g.*, Dkt. No. 249-14, Exh. D, at 22.  In each of the six bags that are the subjects of this portion of Victorinox's motion, the inner side of the third pouch, which Victorinox calls the "intermediate panel," is coextensive with the boundary of the first pouch.  In no respect does the first outer side of any of those six bags define a boundary of the first pouch.  Put differently, if the entire first outer side were to be removed from the bags, the boundaries of the first pouch would be unchanged, because the first pouch is defined by the first proximal end, the first distal end, the first inner side, and the intermediate panel.

---

[3]  The samples provided by Victorinox included the Legacy 17" Slimcase and the Skywalk Flyer, Algorithm, and Odyssey Pro-Check backpacks.  The samples did not include the Sierra Slimcase or the Algorithm USB backpack, but Victorinox contends that the samples are representative of those two backpacks as well.  Targus has not challenged that assertion, so I will treat all six of the accused bags that Victorinox focuses on together for purposes of this discussion.

A comparison with the Legacy backpack makes the point even more clearly. The Legacy backpack is not one of the bags Victorinox contends is non-infringing on the grounds discussed in this section. Unlike in the Algorithm backpack, for example, the intermediate panel of the Legacy backpack is not coextensive with the boundary of the first pouch. That is, the inner side of the third pouch of the Legacy backpack (i.e., the intermediate panel) ends approximately one inch below the zipper of the first pouch. For the approximately one-inch space between the zipper and the intermediate panel, the first outer side undisputedly defines a boundary of the first pouch.[4] Put differently, if the entire first outer side were to be removed from the Legacy backpack, the boundary of the first pouch would be altered because a one-inch portion at the top of the first pouch would be open to the outside. That difference further illustrates that in the six bags that Victorinox focuses on as non-infringing with respect to this issue, the first outer side does not define any portion of the outer boundary of the first pouch.

In the alternative, Targus argues that the first outer side could be the intermediate panel rather than the outside portion of the bag that Mr. Wada identifies in the above pictures. Dkt. No. 257 at 14–16. The problem with that argument is that the claims require the first outer side to lie "flat upon a same planar surface" as the second outer side. '578 patent, cl. 1. If the first outer side is not on the outside of the bag, it would not lie flat *upon the same planar surface* (e.g., a security scanning belt) when the bag is in the unfolded configuration; instead, it would lie upon another component of the bag.[5] By analogy, if a stack of ten books were placed on a desk, it could fairly

---

[4] Victorinox agreed at the oral argument that in the Legacy backpack, the first outer side defines a portion of the first pouch.

[5] Targus argues in its brief that there is a factual dispute regarding whether the intermediate panel is "exposed" in any of the accused bags. Dkt. No. 257 at 15–16. The problem with that argument is that it appears to reflect a misunderstanding of what Mr. Poulson identifies as the intermediate panel. Referring to the figures shown above, Targus suggests that the intermediate panel consists of a portion of the outside of the bag. That is incorrect, as Victorinox's contention

be said that the bottom book in the stack lies flat upon the planar surface, i.e., the top of the desk. The same could not be said, however, for the top book in the stack, which would lie flat on the ninth book in the stack, but would not lie flat upon the desk. Targus disagrees, arguing that the first outer side "merely needs to be 'supported by' the same planar surface." Dkt. No. 257 at 16. That assertion, however, is inconsistent with the language of the claims. Returning to the book analogy, the top book in the stack could be said to be "supported by" the desk or even the floor on which the desk is placed. But no one could reasonably argue that the top book in the stack lies flat upon the floor. For that reason, Targus's position that the first outer side could be the intermediate panel is unpersuasive.

Accordingly, summary judgment will be granted that the Sierra Slimcase, Legacy 17" Slimcase, Skywalk Flyer, Algorithm, Algorithm USB, and Odyssey Pro-Check bags do not infringe because the first outer sides of those bags do not define the first pouch.

### 3. *"defining a first pouch"*

Victorinox next argues that the Legacy, Buffer, CyberWork, Pro-Check 15", Pro-Check 17", and Vysionpoint Pro backpacks, as well as the Legacy Triple Gusset briefcase, do not satisfy the requirement of claim 1 that the first outer side, first inner side, first proximal end, and first distal end "defin[e] a first pouch." According to Victorinox, the claim requires that "those four features and no other features define the boundaries of the first pouch." That requirement is not satisfied, according to Victorinox, because the first pouch in each of the above-listed bags is also defined in part by an intermediate panel, and not exclusively by the four elements recited in claim 1. Dkt. No. 248 at 24–25 (emphasis omitted).

---

is that the intermediate panel is the inner side of the third pouch. For that reason, the intermediate panel cannot be said to lie flat upon a same planar surface as the second outer side.

During the claim construction proceedings in this case, the parties agreed that the phrase "defining a first pouch" in claim 1 should be construed to mean "delineating the boundaries of a first pouch," and the court adopted that construction. Dkt. No. 156 at 1. Victorinox now argues that the use of the words "the boundaries" in the court's construction requires that the first pouch be defined by the four elements recited in the claim and no other elements. Because the intermediate panel defines a boundary of the first pouch, Victorinox argues, that limitation is not satisfied. Targus responds that the claims are not so limited, and that other elements of the bag may define the boundaries of the first pouch as long as the four elements listed in the claim also serve to define the boundaries of the pouch in some respect.

Victorinox's position is unpersuasive for two reasons. First, Victorinox has waived this theory of non-infringement. In a contention interrogatory, Targus asked Victorinox to "explain the full and complete basis for each non-infringement contention," separately for each accused product. Dkt. No. 245-2, Exh. 23, at 5. For the seven bags Victorinox focuses on with respect to this issue, Victorinox stated that the bags did not infringe for two reasons: (1) "A three-dimensional pouch must be defined by six sides, but the limitation only identifies four sides"; and (2) "Even if a pouch could be defined by four sides, the first pouch is not defined by the first outer side. Instead, the first outer side defines in part the third pouch (or otherwise defines in part another pouch)." *Id.* at 25, 30, 46, 51, 60, 70. With respect to the Legacy backpack, Victorinox added that "the first pouch is not defined by the first distal end" and argued that "[i]nstead, the top of the first pouch is below the first distal end of the first storage section, and protrudes outward." *Id.* at 35. None of those contentions can fairly be read as encompassing the argument that Victorinox now makes: that the four sides recited in the claim are the *only* components that may define the boundaries of the first pouch. As multiple courts have held, the failure to disclose a defense in response to a

contention interrogatory results in a waiver of the defense.  *Asia Vital Components Co. v. Asetek Danmark A/S*, 377 F. Supp. 3d 990, 1003–05 (N.D. Cal. 2019); *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, No. 14-cv-01352, 2019 WL 8138163, at *21–22 (C.D. Cal. Nov. 20, 2019), *aff'd*, 35 F.4th 1367 (Fed. Cir. 2022); *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-cv-04238, 2021 WL 2197954, at *7 (N.D. Cal. June 1, 2021).  Victorinox has therefore waived this argument.

Second, Victorinox's position regarding the construction of the phrase "defining a first pouch" is unpersuasive even in the absence of waiver.  As Victorinox recognized in its response to Targus's contention interrogatory, "[a] three-dimensional pouch must be defined by six sides," but the "defining a first pouch" limitation recites four elements that define the first pouch.  Dkt. No. 245-2, Exh. 23, at 25.  That fact, however, weighs against Victorinox's reading of claim 1 because a first pouch would necessarily need to be defined by at least five elements.[6]  To require otherwise would leave claim 1 with an extremely narrow scope, or perhaps no scope at all.  Moreover, it would not be improper to say, for example, that the four walls of a room delineate the boundaries of the room.  However, in that example, it could also be true that the floor, ceiling, doors, and windows in the room also serve to define the boundaries of the room.  For those reasons, the court agrees with Targus that the boundaries of the first pouch need not be exclusively defined by the first outer side, first inner side, first proximal end, and first distal end, so long as each of those elements defines the boundaries of the first pouch in some respect.

### 4. *"first distal end defining a first pouch"*

Victorinox argues that the Legacy 16" Double Gusset bag does not infringe because the first pouch of that bag is not defined by its first distal end.  As shown in Mr. Wada's expert report

---

[6]  In the case of a pouch that is open at the top, the five elements would be the front, back, bottom, and two sides of the pouch.  In the case of a pouch that is not open at the top, the pouch would be defined by six elements.

(and reproduced below), Targus asserts that the first distal end of that bag is the end of the bag that is opposite the hinge.  That assertion is consistent with the court's construction of "distal end" as meaning "the end that is furthest away from the hinge."  Dkt. No. 156 at 1.  Mr. Wada also identified the portions of the bag that he asserted were the first outer side (highlighted in orange) and the first pouch (highlighted in purple).



Dkt. No. 249-14, Exh. C, at 6.

As Mr. Poulson pointed out, however, the end of the bag that is opposite the hinge extends approximately one inch beyond the boundary of what Mr. Wada identified as the first pouch:



Dkt. No. 249-11, Exh. B ¶ 76.

Targus argues that Victorinox's position is incorrect because there is no requirement that the first distal end "be a 'point' or a certain length."  Dkt. No. 257 at 20–21.  Targus draws an analogy to a pickup truck, arguing that the rear end of a pickup truck would include not only the

trailer hitch but also the tailgate and the bumper of the truck.  *Id.* at 21.  However, the court need not resolve where the precise boundary of the "first distal end" is located, because regardless of how the first distal end is defined no reasonable jury could find that the first distal end defines the first pouch.

As made clear by the illustrations above and reinforced by the court's inspection of the sample bags provided by Victorinox, the boundary of the pouch that Mr. Wada refers to as the first pouch is plainly defined by the first proximal end of the bag, the first outer side, and the first inner side.  The top of the first pouch is defined by the zipper that joins the first outer side to the central portion of the bag.  In no way does the first distal end of the bag, i.e., the end of the bag that is opposite the hinge, define the boundary of the first pouch.  The court concludes that no reasonable jury could find otherwise.

In its brief, Targus argues that this question must be submitted to a jury because Mr. Wada offered the opinion that the first distal end defines the boundary of the first pouch.  Dkt. No. 257 at 22.  However, Mr. Wada failed to explain how the first pouch is defined in any respect by the first distal end.  His opinion on that point amounts essentially to the conclusory assertion that "[t]here is no question that the distal end of the first storage section defines the top of the first pouch."  Dkt. No. 260-1 ¶ 18.  As the Federal Circuit has explained, "[t]he mere existence of dueling expert testimony does not necessarily raise a genuine issue of material fact."  *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325 (Fed. Cir. 2016).  Rather, the appropriate inquiry is whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citation omitted).

Accordingly, summary judgment will be granted to Victorinox that the Legacy 16" Double Gusset bag does not infringe the claims of the '578 patent.

### 5. *"the second storage section configured without an additional pouch"*

Victorinox argues that the Buffer, CyberWork, and ProCheck 17" backpacks do not infringe the asserted claims because they do not contain a "second storage section configured without an additional pouch." Dkt. No. 248 at 28–29. Specifically, Victorinox argues that the shoulder straps of each of those three backpacks contain a small mesh pouch, which constitutes an "additional pouch" in the second storage section. As such, Victorinox argues, that structure is inconsistent with the requirements of claim 1. Targus disagrees, arguing that the shoulder straps are not part of the second storage section, and therefore that the mesh pouch on the shoulder straps does not constitute an "additional pouch" for purposes of claim 1. This dispute presents a claim construction issue that was not raised during the claim construction proceedings earlier in the case, so I will resolve it now.

In support of its position that the second storage section includes the shoulder straps, Victorinox points to dependent claim 44, which recites as follows:

> 44. The case of claim 1, wherein the case is configured as a backpack and further comprising first and second shoulder straps coupled to the second outer side of the second storage section, the first and second shoulder straps configured to receive a user's shoulders to support the case.

'578 patent, cl. 44.

Victorinox argues that because the shoulder straps are described as being "coupled to the second outer side of the second storage section," they must necessarily be a part of the second storage section. Dkt. No. 248 at 29. Victorinox compares that language to a limitation of independent claim 17, which recites "a third pouch coupled to the first outer side." *Id.* (quoting '578 patent, cl. 17). In Victorinox's view, because the parties agree that the third pouch recited in claim 17 is part of the first storage section, the natural conclusion is that the parallel

17

language in claim 44 regarding shoulder straps means that the shoulder straps are part of the second storage section.

Victorinox's argument based on a comparison of the language in claim 44 with the language in claim 17 is unpersuasive. The language of claim 17 quoted by Victorinox recites a first storage section "wherein the first storage section comprises a third pouch coupled to the first outer side." '578 patent, cl. 17. That language makes it quite clear that the third pouch is part of the first storage section. By contrast, there is no express statement in claim 44 or elsewhere in the '578 patent that the second storage section comprises shoulder straps.

Most importantly, the plain meaning of the claims does not support a conclusion that the shoulder straps are part of the second storage section. The plain meaning of the phrase "second outer side" indicates that it forms the outer boundary of the second storage section. The recitation in claim 44 of shoulder straps that are "coupled to the second outer side" strongly suggests that the shoulder straps are attached to the outside of the second storage section. *Id.* at cl. 44. Moreover, the term "second storage section" would on its face appear to refer to a portion of the case that is used for storage. But as claim 44 recites, the shoulder straps do not principally serve the purpose of storage; rather, they are "configured to receive a user's shoulders to support the case." *Id.* The "storage" feature of the shoulder straps is merely incidental.

For the above reasons, the court construes the phrase "second storage section" as not including shoulder straps that may be attached to the second outer side. Accordingly, summary

judgment will not be granted on the ground that the Buffer, CyberWork, and ProCheck 17"
backpacks contain an additional pouch on the shoulder straps.

### B.   Marking

Victorinox argues that Targus is not entitled to damages for any infringement that occurred
prior to March 27, 2020 (the date, a week before the complaint was filed, on which Targus provided
Victorinox with actual notice of infringement), because Targus did not comply with the patent
marking statute, 35 U.S.C. § 287.   In particular, Victorinox asserts that Targus's use of paper
hangtags to mark some of its products is insufficient as a matter of law to satisfy the statutory
marking requirement.  Dkt. No. 248 at 31–32.

Section 287(a) of the Patent Act provides that when a patentee makes or sells a "patented
article," the patentee is entitled to damages for infringement of the patent only if it marks the article
or provides actual notice to the infringer.  35 U.S.C. § 287(a).  The Federal Circuit has made clear
that in order to satisfy the marking requirement, a patentee must mark "substantially all of its
patented products" in a "substantially consistent and continuous" manner. *Am. Med. Sys., Inc. v.
Med. Eng'g Corp.*, 6 F.3d 1523, 1537–38 (Fed. Cir. 1993).  Victorinox argues that because, in its
view, the hangtags did not suffice to constitute "marking" within the meaning of the statute, Targus
cannot be deemed to have marked substantially all its products in a consistent and continuous
manner.  Dkt. No. 248 at 33–36.

Section 287(a) provides that, for a patentee to adequately mark its products, the patentee
must "fix thereon the word 'patent' or the abbreviation 'pat.'" together with either the number of
the patent or the address of a "posting on the Internet . . . that associates the patented article with
the number of the patent."  35 U.S.C. § 287(a).  Alternatively, "when, from the character of the
article, [marking directly on the product] can not be done," the patentee may fix to the product or

its packaging "a label containing a like notice." *Id.* Thus, while "the patentee may elect to mark the packaging of a patented product instead of the product itself," the choice to do so "is not entirely discretional." *Belden Techs. Inc. v. Superior Essex Commc'ns LP*, 733 F. Supp. 2d 517, 534 (D. Del. 2010).

In determining whether a patentee was permitted to mark the packaging of a product rather than the product itself, courts have looked to the "feasibility or practicality" of marking the product itself. *See, e.g.*, *id.*; *Rutherford v. Trim-Tex, Inc.*, 803 F. Supp. 158, 162 (N.D. Ill. 1992) (noting that "physical constraints or other limitations," such as "[t]he size of an article" may be relevant to the determination of whether the article itself must be marked); *Wayne-Gossard Corp. v. Sondra, Inc.*, 434 F. Supp. 1340, 1364 (E.D. Pa. 1977), *aff'd sub nom. Wayne-Gossard Corp. v. Sondra Mfg. Co.*, 579 F.2d 41 (3d Cir. 1978) ("The Court recognizes that there may be a point where the marking could be so expensive as to be impractical."). But as the court in *Rutherford* explained, courts generally "do not severely scrutinize the character of the patented articles to determine whether the article was capable of being marked." *Rutherford*, 803 F. Supp. at 162. Courts have been similarly reluctant to grant summary judgment of non-compliance with section 287(a) unless "no reasonable factfinder could find compliance." *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 257 F. Supp. 3d 159, 165 (D. Mass. 2017) (citation omitted).

In this case, the key question is whether it was sufficiently infeasible or impractical for Targus to mark its patented cases that it was permissible under section 287(a) for Targus to use a hangtag to mark those cases. In support of its argument that it would have been feasible for Targus to mark all its bags by placing the patent number on the outside of the bag or on an inside surface of the bag rather than by placing the patent number on a hangtag, Victorinox points to evidence that Targus has marked some of its bags by printing a silkscreen marking notice on the inside of

its bags.  Dkt. No. 248 at 34 (citing Dkt. Nos. 249-23, 249-24).  Victorinox also argues that the specification of the '578 patent discloses that the bags can be marked with an "identifier" such as a "logo, symbol, or graphic that is easily viewed during screening."  '578 patent, col. 18, ll. 51–54.

Victorinox also cites a handful of cases in which courts have held that a patentee was not permitted to mark a product's packaging because there was other information marked on the product itself.  *See, e.g.*, *Belden*, 733 F. Supp. 2d at 535; *Black & Decker Corp. v. Positec USA Inc.*, No. 11-cv-5426, 2015 WL 1543262, at *23–24 (N.D. Ill. Mar. 31, 2015); *Kadant Johnson, Inc. v. D'Amico*, No. 10-cv-2869, 2012 WL 38319, at *5–6 (E.D. La. Jan. 9, 2012).  Those cases are distinguishable from this case.

In *Belden*, the patentee sold data cables and marked the packaging of its cables rather than the cables themselves.  *Belden*, 733 F. Supp. 2d at 535.  The patentee's cables were required by regulation to have certain information printed on each cable, and the patentee's own employees testified that printed content could be added or removed from the cable with "relative ease."  *Id.* Ultimately, the court concluded that the patentee's marking efforts were inadequate because the patentee "failed to identify a fact issue with respect to any limitation, physical or otherwise, that presents a reasonable consideration warranting the marking of the product packaging instead."  *Id.* The court added that the patentee's "inclusion of substantial printed content on its cables demonstrate[d] the absence of any such limitation."  *Id.*

Although not expressly noted by the court in *Belden*, one important difference between that case and this one is the level of notice provided by marking the product itself rather than the packaging.  For the data cables at issue in *Belden*, it is fair to infer that marking the outside of the cable itself would provide greater notice to potential infringers than marking the packaging in

which the cables were sold, which was likely to be discarded after the time of purchase. *See id.* (noting that, "in some certain applications, large sections of [the patentee's] cable products are plainly accessible," i.e., not hidden from view). In that respect, *Belden*'s cables are quite different from Targus's bags; a marking notice printed on the inside of one of Targus's bags, which in most instances would be closed, would likely be less noticeable than a hangtag attached to the product at the point of sale. Dkt. No. 260-1 ¶ 118; *see also Glob. Traffic Techs., LLC v. Emtrac Sys., Inc.*, 946 F. Supp. 2d 884, 907 (D. Minn. 2013), *aff'd sub nom. Glob. Traffic Techs. LLC v. Morgan*, 620 F. App'x 895 (Fed. Cir. 2015) ("Whether marking on the packaging served as the most effective notice to the public of this product, given its multiple and hidden components, is a fact issue for trial."). In view of the Supreme Court's "long-standing focus on the notice provided by the method of marking the patented article rather than on the precise mechanistic compliance with the statute," the difference between this case and *Belden* weighs against precluding Targus from marking its bags using hangtags. *See Rutherford*, 803 F. Supp. at 161.

The *Black & Decker* and *Kadant* cases are similarly inapposite. In *Black & Decker*, the plaintiffs offered "no evidence that their alternative package markings were justified by specific circumstances, such as the size of the product, the cost of marking the product as opposed to the packaging, industry norms, or adequate notice." *Black & Decker*, 2015 WL 1543262, at *24. And in *Kadant*, the patentee's products included an "identification plate" that listed several attributes of the product, including the patentee's website address and the model number of the product. The court found the patentee's marking efforts to be inadequate in large part because the plaintiff

provided "no explanation as to why the patent information [could] not, like the other information, be stamped or embossed on the [identification] plate." *Kadant*, 2012 WL 38319, at *5.

In this case, by contrast, Mr. Wada explained in his report why marking the patented bags using hangtags would be preferable to marking the bags themselves. Specifically, he noted that marking using hangtags rather than marking the inside of the bags themselves is "more practical for visibility purposes as customers (including consumers, retailers, and distributors) will not, and may not have the opportunity to, open and examine the inside of the bag before purchasing it." Dkt. No. 260-1 ¶ 118. Mr. Wada added that "screen-printing the patent number on the outside of the bag is not practical because it detracts from the bag's aesthetic appeal and will make consumers less likely to purchase the bag." *Id.* Thus, he explained, "marking the hangtag is the best way to ensure visibility without damaging the aesthetic appeal of the bag." *Id.*

Targus has also pointed to evidence that Victorinox uses hangtags to provide consumers with "required legal notices" that apply to its bags.[7] Dkt. No. 257 at 26 (citing Dkt. No. 258-2, Exh. 40). To be sure, the fact that a patentee's competitor marks its products' packaging rather than the products themselves is not always viewed as dispositive of the question whether the marking requirements have been satisfied. *Belden*, 733 F. Supp. 2d at 535 (granting summary judgment that marking was insufficient even though the alleged infringer "typically marks the cable packaging rather than the cable itself"). However, several courts, including the court in *Belden*, have recognized that "an industry-wide custom of marking product packaging" can be

---

[7] During the oral argument, Victorinox argued that this evidence was not relevant because Victorinox's hangtags did not contain *patent* marking information. I disagree. Although the fact that Victorinox's tags do not contain patent markings may detract somewhat from the weight of that evidence, the fact that Victorinox used a hangtag to provide required legal notices is probative of whether it was feasible to include such required information (which would include patent marking information) on the bags themselves.

relevant in assessing compliance with the marking statute. *Id.*; *see also Stryker Corp. v. Zimmer Inc.*, No. 1:10-cv-1223, 2012 WL 6821683, at *3 (W.D. Mich. Nov. 29, 2012), *aff'd*, 837 F.3d 1268 (Fed. Cir. 2016) (considering, among other factors, "industry norms for marking similar products"); *Rutherford*, 803 F. Supp. at 163 (recognizing that "custom of the trade could be a relevant factor in allowing alternate marking of the package"). Particularly given the notice considerations discussed above, evidence of how Victorinox includes required legal information on its bags is relevant to whether Targus may be permitted to mark its bags using hangtags.

The court in *Stryker* outlined a list of non-exhaustive factors for determining whether "the decision not to mark the actual product is unreasonable": (1) the size of the product; (2) other practical considerations, such as the costs of marking the product itself rather than marking the packaging; (3) industry norms for marking similar products; and (4) whether an alternative form of marking would provide users with adequate notice of the patent. *Stryker*, 2012 WL 6821683, at *3. Those factors are helpful in considering the adequacy of marking in this case. And Targus has pointed to a genuine dispute of material fact with respect to three of those factors: practical considerations (e.g., the aesthetics of the bag), industry norms, and the notice provided by an alternative form of marking.

In view of the record evidence, I conclude that a reasonable factfinder could conclude that Targus complied with section 287(a) when it marked its bags using hangtags rather than marking the bags themselves. Assuming that the hangtags are found to be compliant with section 287(a), Targus's damages expert, Christian Tregillis, has offered evidence that at least 80 percent of Targus's products were marked after February 1, 2016, and at least 85 percent of Targus's products were marked after July 1, 2016. Dkt. No. 259-1 ¶ 174. Courts have consistently found percentages in that range to raise at least a genuine dispute of material fact regarding whether substantially all

the patentee's products were consistently and continuously marked.  *See, e.g.*, *Koninklijke*, 257 F. Supp. 3d at 165 (summary judgment of no damages denied where the patentee marked between 65% and 73% of its products); *Stryker*, 2012 WL 6821683, at *4 (finding a question of material fact "as to whether Stryker's marking . . . 83.37% of the commercial embodiments of its patents" satisfied the marking statute); *Imagexpo, L.L.C. v. Microsoft Corp.*, 299 F. Supp. 2d 550, 554 (E.D. Va. 2003) (summary judgment denied where the plaintiff provided evidence that approximately 85% of the patented products were properly marked).

Because a reasonable factfinder could conclude that Targus complied with section 287(a) by marking its patented bags with hangtags, and if it so found could also conclude that Targus marked substantially all its bags, I hold that Victorinox is not entitled to summary judgment that Targus is guilty of a marking violation depriving it of the right to an award of any damages for infringement occurring before March 27, 2020.

### C.   Willful Infringement

Victorinox next argues that Targus cannot establish that Victorinox willfully infringed the claims of the '578 patent prior to March 27, 2020.  In its brief, Targus agreed to stipulate to no willful infringement by Victorinox prior March 27, 2020.  Dkt. No. 257 at 33.  Accordingly, Victorinox's motion for summary judgment is denied as moot with respect to willful infringement.

### D.   Expert Testimony

Victorinox concludes with the argument that the opinions of Mr. Wada and Mr. Tregillis regarding non-infringing alternatives should be excluded "because they rely on outdated TSA [Transportation Security Administration] materials that do not reflect the state of TSA's policies during the alleged damages period."  Dkt. No. 248 at 37.  Specifically, Victorinox challenges those experts' reliance on a document referred to as the "TSA Guidelines," which Victorinox asserts did

not represent the operative TSA guidelines as of the beginning of the damages period in this case. Victorinox argues that the experts' opinions are therefore not "the product of reliable principles and methods" as required by Federal Rule of Evidence 702.  *Id.* at 37–38 (quoting Fed. R. Evid. 702).

The TSA Guidelines document is an archived press release dated August 15, 2008, and titled "'Checkpoint Friendly' Laptop Bag Procedures."  Dkt. No. 249-20.  That document sets forth a number of requirements for bags that, if satisfied, would allow travelers to keep their laptops in their bags while moving through airport security.  *Id.*  Mr. Wada offered the opinion that none of the non-infringing alternatives proposed by Victorinox were acceptable alternatives because none satisfied the requirements set forth in the TSA Guidelines.  Dkt. No. 249-14 ¶ 66; *see generally id.* ¶¶ 67–188.  Mr. Tregillis excluded several potential non-infringing alternatives from his damages analysis for the same reason.  Dkt. No. 249-21 ¶¶ 179, 235, 247.

Victorinox argues that the opinions of Mr. Wada and Mr. Tregillis are unreliable because the TSA Guidelines were no longer in effect as of at least September 2015.  According to Victorinox, by that time "the TSA no longer had a policy regarding checkpoint friendly bags, and instead its policy stated that only TSA PreCheck passengers could leave their laptops in carry-on bags."  Dkt. No. 248 at 39–40 (citing Dkt. No. 249-22).  The evidence relied on by Victorinox, however, does not state that checkpoint-friendly bags are not permitted in the general security lanes; it states merely that "[w]ith TSA Precheck®, you are able to speed through security and don't need to remove your shoes, laptops, liquids, belts and light jackets."  Dkt. No. 249-22.

Moreover, Targus has pointed to two webpages from 2019 and 2023 indicating that the TSA continues to allow passengers with checkpoint-friendly bags to leave their laptops inside their bag during security screening.  Dkt. No. 258-2, Exh. 37; *id.*, Exh. 38.  And Mr. Poulson,

Victorinox's expert, did not express the opinion that the TSA Guidelines did not reflect current TSA policy.  In fact, he argued that several of his proposed non-infringing alternatives were consistent with those guidelines.  *See, e.g.*, Dkt. No. 249-11 ¶¶ 268–69, 272, 281, 290, 304.  For those reasons, there is at least a factual dispute as to whether the TSA permitted the use of checkpoint-friendly bags during the period of alleged infringement in this case.

Based on the parties' presentations in this case, I am satisfied that Targus has demonstrated by preponderant evidence that the opinions of Mr. Wada and Mr. Tregillis are the product of a reliable application of the relevant principles and methods.  *See* Fed. R. Evid. 702; *Sardis*, 10 F.4th at 283–84.  Victorinox's arguments as to the inapplicability of the TSA Guidelines are points that may be raised on cross-examination or in rebuttal, as those concerns are relevant to the weight of the testimony of Messrs. Wada and Tregillis.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  Accordingly, Victorinox's motion to exclude the testimony of Mr. Wada and Mr. Tregillis is DENIED.

### IV.    **Targus's Motions**

I now proceed to Targus's motion for summary judgment and motion to exclude expert testimony under *Daubert*.  Targus moves for summary judgment that (1) a request for information sent by the TSA to Targus and others, referred to as the "TSA RFI," is not prior art to the asserted claims; (2) Victorinox has not established inequitable conduct; and (3) Victorinox has not established that other checkpoint-friendly bags, developed at about the same time as Targus's patented bags, qualify as simultaneous inventions.  Targus also moves to exclude the testimony of Michele M. Riley, Victorinox's damages expert, and Mr. Poulson, Victorinox's infringement and invalidity expert.

### A.   The TSA RFI as Prior Art

Targus first moves for summary judgment that the TSA RFI is not prior art under the version of sections 102(a) and 102(f) of the Patent Act that preceded the effective date of the Leahy-Smith America Invents Act ("AIA").  The pre-AIA versions of those statutes, which apply to this case, provide as follows:  pre-AIA section 102(a) states that a person shall be entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant"; pre-AIA section 102(f) states that a person shall be entitled to a patent unless "he did not himself invent the subject matter sought to be patented."  35 U.S.C. § 102(a), (f) (2008).

The TSA sent the RFI to Targus and other bag manufacturers in March 2008.  Dkt. No. 245-2, Exh. 39.  In the RFI, the TSA explained that it was seeking "bag designs that would allow passengers to not remove their laptops from carry-on bags for security screening."  *Id.*, Exh. 54, at 1.  The TSA also offered a few "illustrative examples," including "[a] bag that would open completely so that each side of the bag would lie horizontally on the x-ray belt," where "[o]ne side of the bag would be designed to hold the laptop and nothing else."  *Id.* at 2.  Victorinox asserts that the concepts disclosed in the TSA RFI are prior art to the claims of the '578 patent.  Targus responds that the TSA developed its RFI in consultation with Targus, and thus the RFI was not prior art because it was not invented "by another."  Dkt. No. 244 at 11.  Targus also argues that, in any event, the RFI contains nothing more "than what Targus had already developed before its issuance."  *Id.* at 12 (citing *In re Stempel*, 241 F.2d 755, 759 (C.C.P.A. 1957)).

At the outset, I note that Victorinox's use of the TSA RFI at trial will be limited by IPR estoppel.  Under 35 U.S.C. § 315(e)(2), the petitioner in an *inter partes* review ("IPR") proceeding, or a real party in interest or privy of the petitioner, is estopped from arguing in district court that

28

the asserted claims are invalid "on any ground that the petitioner raised or reasonably could have raised" during the IPR proceeding.  Earlier in this case, when Judge Andrews granted Victorinox's motion to stay the proceedings pending an IPR proceeding initiated by another entity, he ordered that Victorinox would be "subject to the same estoppel in 35 U.S.C. § 315(e) as if it were a petitioner" in that proceeding.  Dkt. No. 199 at 2.  It is undisputed that the petitioner in the IPR proceeding raised the TSA RFI as prior art.  Dkt. No. 245-2, Exh. 25, at 55.  Accordingly, Victorinox is barred from relying on the TSA RFI as an anticipating reference or as part of a combination that reasonably could have been raised in the IPR proceeding.[8]

Even if the TSA RFI is ultimately held to be inadmissible for purposes of assessing the invalidity of the asserted claims, I address Targus's arguments regarding the TSA RFI because determining whether the TSA RFI is prior art is relevant to the issue of inequitable conduct, which may need to be resolved in a bench trial after the completion of the jury trial in this case.  As Victorinox points out, a determination of inequitable conduct is "in no way affected by IPR estoppel" because inequitable conduct "cannot be raised in such a proceeding."  *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 271 F. Supp. 3d 990, 1030 (E.D. Wis. 2017) ("To the extent any reference [raised in an IPR proceeding] can be used to support another ground of relief not available to an IPR petitioner, it can be used for that purpose.").

---

[8]   As Victorinox explained at the oral argument, it intends to rely on the TSA RFI in combination with physical products, for example the "Samsonite L35" bag.  Victorinox is not barred from raising the combination of the TSA RFI with device art, such as those products, unless that combination is effectively a "printed publication invalidity theory in disguise."  *IOENGINE, LLC v. PayPal Holdings, Inc.*, 607 F. Supp. 3d 464, 513 (D. Del. 2022).  Targus has not made an argument to that effect in its briefing, so I will assume for present purposes that Victorinox's proposed combination is not barred under 35 U.S.C. § 315(e).

### 1. *Whether the TSA RFI Disclosed Targus's Invention*

Targus first argues that the TSA RFI was not "by another" because, when TSI published the RFI, it merely disclosed concepts it had previously received from Targus. Dkt. No. 244 at 10. The parties' evidence on this question presents two radically different accounts of Targus's role in the development of the TSA RFI.

Targus relies heavily on the testimony of Todd Gormick, one of the inventors of the '578 patent. According to Mr. Gormick, Targus hired an outside consultant, Innovation Focus, LLC, to coordinate two brainstorming sessions called "Innovation Days" in July and October 2007. Dkt. No. 245-2, Exh. 26 ¶¶ 7–13. One of the ideas that was discussed at the Innovation Days sessions was "a bag that could ease passage through airport security." *Id.* ¶ 12. Mr. Gormick stated in a declaration that he began working on "functional ideas for the checkpoint-friendly case project in October 2007." *Id.* ¶ 14.

In the meantime, Mr. Gormick testified, Targus continued to work with Innovation Focus, which "communicat[ed] with the TSA on Targus'[s] behalf in an effort to obtain TSA approval" for Targus's checkpoint-friendly bags. *Id.* ¶ 15. However, according to Mr. Gormick, the TSA was reluctant to provide feedback to Targus. In support of Mr. Gormick's testimony, Targus points to an email sent by Bryan deBlois, an Innovation Focus employee to Mr. Gormick and Bui Cuong, another named inventor of the '578 patent. In that email, Mr. deBlois stated that "[i]t appears that they [the TSA] feel it is in their best interest to protect information and keep things vague." Dkt. No. 245-2, Exh. 32.

Although Targus received no feedback from the TSA, Mr. Gormick stated that Targus moved forward with its bag designs. *Id.*, Exh. 26 ¶ 25. Mr. Gormick stated that the industrial design of a prototype checkpoint-friendly bag was complete by March 1, 2008. *Id.* ¶ 27. The TSA

issued its RFI just days later.  *Id.* ¶ 29.   Contemporaneous communications from the inventors suggest that Targus believed the TSA RFI embodied the ideas that Innovation Focus had communicated to the TSA.  *See, e.g.*, Dkt. No. 245-2, Exh. 38 ("We are working with the TSA on this project (we helped them draft the RFI)."); *id.*, Exh. 37 ("We actually drove this interest with our effort at TSA . . . .  [I]t is a major victory to get the attention of a huge government bureaucracy on this issue.").

In addition to those communications, Targus also argues that the TSA RFI included a disclosure of a "shark-fin" design that Targus had initially considered but ultimately decided was impractical.  Dkt. No. 244 at 7.  That design, as illustrated by notes produced by Targus, would include "a separate section of the bag that only houses the computer and could be raised 90º."  Dkt. No. 245-2, Exh. 36.  The TSA RFI similarly disclosed as an example a bag having sides that, once opened, "would expose the laptop in the middle of the bag being held vertically by clips."  *Id.*, Exh. 54, at 2.  Targus argues that the similarity in those two examples is further evidence that the TSA RFI incorporates Targus's ideas.

For its part, Victorinox argues that the efforts of Targus and Innovation Focus to communicate with the TSA were not the sources of the information contained in the RFI.  Victorinox first points to an email that Mr. deBlois sent to Mr. Cuong on October 23, 2007.  Dkt. No. 262-1, Exh. 35.  In that email, Mr. deBlois explained that up to that point efforts to approach TSA "ha[d] proved fruitless."  *Id.*  He added that one small bag manufacturer had provided "'anecdotal evidence' that [its] laptop brief bag was 'getting through TSA without having to have the laptop removed,'" and that travel sites had begun asking the question, "Why hasn't anyone offered a TSA approved bag?"  *Id.*

Victorinox next points to an email chain that included employees from Innovation Focus, Targus, and the TSA. According to that email chain, Dr. Christopher Miller, the CEO of Innovation Focus, held a call with Ely Kahn, a TSA employee, on December 20, 2007. Dkt. No. 262-1, Exh. 36. Following the call, during which Mr. Kahn indicated that the TSA would be publishing an RFI, Dr. Miller asked Mr. Kahn if Innovation Focus could "come over and show you our beginning thinking." *Id.* Dr. Miller and Mr. deBlois then appeared to engage in multiple unsuccessful attempts to arrange a meeting with the TSA. *Id.*; *see also* Dkt. No. 262-1, Exh. 37 (discussing plans for a potential meeting but indicating that no meeting had been scheduled). In response to those efforts, Mr. Kahn indicated that the RFI would "provide details on the process going forward, but unfortunately federal acquisition regs prohibit me from going into details now." Dkt. No. 262-1, Exh. 36.

Around the same time, Dr. Miller suggested to Mr. deBlois and Mr. Cuong that the TSA was "gaining insight into the bag issue from another source." Dkt. No. 262-1, Exh. 38. That is, he suspected that "another company [was] in conversation with [the TSA], perhaps more than one, and perhaps from outside of the bag industry." *Id.*

On February 21, 2008, Mr. deBlois forwarded to Mr. Cuong an email that Mr. deBlois identified as "the last e-mail [he] was sent from the TSA." Dkt. No. 262-1, Exh. 36. In that email, which was sent on February 7, 2008, another TSA employee told Mr. deBlois that Innovation Focus was "on our contact list for when the RFI is ready for distribution." *Id.* Mr. deBlois added in his email to Mr. Cuong, "I know this is frustrating for you and us as well." *Id.*

The totality of the summary judgment record demonstrates that there are two competing versions of the events relating to the development of the TSA RFI. Based on the evidence summarized above, I conclude that a reasonable factfinder could accept Victorinox's version of

the events, i.e., that the TSA did not generate its RFI based on information it received from Targus, but instead that the TSA developed the RFI independently or in consultation with entities other than Targus and Innovation Focus.  If a jury were to view the evidence in that manner, it could find that the TSA RFI is evidence of another's invention that would be available as prior art under the pre-AIA version of 35 U.S.C. § 102.  Accordingly, Targus is not entitled to summary judgment on this ground.

### 2. *Whether Targus Conceived of the Material Disclosed in the TSA RFI Prior to its Publication*

Targus also argues that, regardless of whether the TSA RFI represented an invention "by another," Targus had already independently developed the information that was disclosed in the TSA RFI.  Dkt. No. 244 at 12–14.  In support of that contention, Targus relies on the decision of the Court of Customs and Patent Appeals in the case of *In re Stempel*, 241 F.2d 755 (C.C.P.A. 1957).  In particular, Targus relies on the *Stempel* court's statement that "all the applicant can be required to show is priority with respect to so much of the claimed invention as the reference happens to show.  When he has done that he has disposed of the reference." *Id.* at 759.  Victorinox argues that the *Stempel* case is inapposite, and that Targus has failed to establish conception of the claimed invention prior to the publication of the TSA RFI.

To resolve the parties' dispute on this issue requires a careful examination of the *Stempel* case.  In *Stempel*, the patent application contained several claims, including both a broad claim directed to a genus of chemical compounds and a narrow claim directed to a single species of that genus.  *Id.* at 756.  A prior art patent disclosed the species recited in the narrow claim but did not disclose the broader genus.  The applicant submitted an affidavit in which he stated that he had made the species compound prior to the filing date of the earlier patent.  *Id.*  In light of the applicant's affidavit, the Patent Office Board of Appeals allowed the species claim but not the

genus claim.  The Board explained that it did so because the affidavit "satisfied the Board that [the applicant] had made the compound as described in [the species claim], but only that compound, prior to the filing date" of the earlier patent.  *Id.*

After reviewing those facts, the Court of Customs and Patent Appeals framed the question presented by the applicant's appeal as follows:

> When a domestic patent discloses only a single species of an invention and the applicant submits an affidavit under Rule 131 showing completion of the invention of that species prior to the effective date of the reference (which does not claim it), can that reference be used as the basis of the rejection of generic claims in the application?

*Id.* at 757.  The court answered that question in the negative, holding that the genus claim was also allowable because the applicant needed to establish priority only "with respect to so much of the claimed invention as the reference happens to show."  *Id.* at 759–60.

Recognizing the unique nature of the issue presented in *Stempel*, courts have applied the holding of that case quite narrowly.  As the Court of Customs and Patent Appeals explained in a later case, the court

> never intended by the language used in *Stempel* to authorize the overcoming of references by affidavits showing that the applicant had invented, prior to the reference date, a part, some parts, or even a combination of parts, used to create an embodiment of his claimed invention, where the part or parts are not within the scope of the claims being sought.

*In re Tanczyn*, 347 F.2d 830, 833 (C.C.P.A. 1965).  The court added that "[a] different situation [from *Stempel*] may prevail when the rejection is based on 35 U.S.C. § 103.  In such a case the purpose of an affidavit is to establish that *the claimed invention* was made by the applicant before the effective date of a reference relied upon to show that the invention was obvious."  *Id.* at 832 (emphasis added).  Thus, the "primary consideration is whether [the inventor] establishes possession of either the whole invention claimed or something falling within the claim, in the sense that the claim as a whole reads on it."  *Id.* at 833.

In subsequent years, the Court of Customs and Patent Appeals continued to address the issues presented in *Stempel* and *Tanczyn*.  In *In re Clarke*, the court held that "in an appropriate case" an applicant's affidavit establishing invention of a single species "could be sufficient to antedate indirectly a different species of a reference."  356 F.2d 987, 992 (C.C.P.A. 1966).  For example, the court explained, it may be sufficient to show that a compound described in a reference "would have been obvious . . . in view of what the affiant proves was completed with respect to the invention prior to the effective date of the reference."  *Id.*  In *In re Stryker*, the court applied the rule of *Stempel* to a situation in which the "the differences between the claimed invention and the reference disclosure are so small as to render the claims obvious over the reference."  435 F.2d 1340, 1341 (C.C.P.A. 1971).  The court explained, however, that the general rule of *Tanczyn* applies when the applicant "showed prior possession . . . of subject matter on which the claims did not read," i.e., the reference and the applicant's affidavit did not disclose something falling within the scope of the claim.  *Id.*  The *Stryker* court elaborated on that rule only slightly, holding that the rule of *Stempel* applies if the difference between the claims and the reference is "so small as to render the claims obvious over the reference."  *Id.*  In *In re Spiller*, the court applied *Stryker* to a similar case in which "the differences in the embodiments called for by the claims are so small that the claimed invention would have been obvious."  500 F.2d 1170, 1176–78 (C.C.P.A. 1974).

More recent authorities are in accord with the holding in *Tanczyn*.  As Judge Sleet explained in *ISCO International, Inc. v. Conductus, Inc.*, 279 F. Supp. 2d 489, 495 n.3 (D. Del. 2003), *aff'd*, 123 F. App'x 974 (Fed. Cir. 2005), the rule of *Stempel* does not apply "to references used to challenge a patent on a § 103 obviousness basis."  *See also* 2 Donald S. Chisum, Chisum on Patents § 3.08[1][b][i] (Matthew Bender ed. 2022) (identifying a "possible distinction between anticipation under Section 102(a) and nonobviousness under Section 103" for purposes of the

holding in *Stempel*).  Moreover, Judge Sleet added, "the *Stempel* rule is limited to prior possession of a part of the invention, *i.e.*, something falling within the scope of the claim."  *ISCO*, 279 F. Supp. 2d at 495 n.3; *see also* Chisum on Patents § 3.08[1][b][i].

Those authorities demonstrate that *Stempel* is inapplicable to this case.  Victorinox is not relying on the TSA RFI as an anticipatory reference, and the TSA RFI on its face does not appear to disclose an embodiment on which the asserted claims would read.  Nor do the exceptions identified in *Clarke, Stryker,* and *Spiller* apply, as Victorinox is not contending that the asserted claims would have been obvious over the TSA RFI alone or that the differences between the TSA RFI and the claims are very small.  Moreover, "it cannot be said that the present case involves a chemical composition, alloy, or other invention which is a 'species' of the generic claimed invention."  *ISCO*, 279 F. Supp. 2d at 495 n.3.  For those reasons, Targus cannot dispose of the TSA RFI by showing only that, prior to the publication of the TSI RFI, the inventors conceived of those aspects of the invention that were disclosed in the RFI.

In its reply brief, Targus makes clear that it is not seeking summary judgment of "complete conception of the claimed invention prior to issuance of the TSA RFI."  Dkt. No. 271 at 3.  Instead, Targus explains, it seeks summary judgment "based on *In re Stempel* and its progeny that the TSA RFI is not prior art because it contains no more than the inventors had already achieved at least two months before the RFI issued."  *Id.*  Because the *Stempel* holding is inapplicable to this case, summary judgment will not be granted on the ground advanced by Targus.  Of course, Targus remains free at trial to seek to establish that the inventors conceived the complete invention prior to the publication of the TSA RFI.

### B.   Inequitable Conduct

Targus next moves for summary judgment with regard to Victorinox's defense and counterclaim of inequitable conduct.  The Federal Circuit has articulated the standard that an accused infringer must meet to prevail on the defense of inequitable conduct:  The accused infringer "must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc).  The standard for materiality required to establish inequitable conduct is "but-for materiality"; that is, "prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291.  To establish specific intent to deceive, which is a separate requirement from materiality, the accused infringer must show that "the specific intent to deceive [is] 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* at 1290 (citation omitted).  More generally, the Federal Circuit has "'urge[d] caution' in making an inequitable conduct determination at the summary judgment stage." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1340 (Fed. Cir. 2006) (citation omitted).

Victorinox's claim of unenforceability due to inequitable conduct rests on allegations that the inventors failed to disclose two references during prosecution of the '578 patent:  (1) the TSA RFI and (2) a group of prior art computer cases referred to as the "Targus Legacy Bags."  Dkt. No. 172 ¶¶ 49–50.  Targus argues that even if the TSA RFI is prior art, the TSA RFI is not but-for material prior art, as is required for a finding of inequitable conduct.  Dkt. No. 244 at 17–18. Targus also argues that there is no evidence that Targus's representatives intended to deceive the PTO by failing to disclose either the TSA RFI or the Targus Legacy Bags.  *Id.* at 18–23.

### 1.   *Material Prior Art*

Targus argues that the TSA RFI is not material prior art because the evidence shows that "the PTO would have allowed the claims of the '578 patent had it been aware of the TSA RFI." Dkt. No. 244 at 17.  In particular, Targus notes that the PTO considered the TSA RFI during an IPR proceeding involving the '578 patent and found all  the asserted claims in this case to be not unpatentable over the TSA RFI in combination with other references.  Dkt. No. 245-2, Exh. 25, at 55.

In support of its argument, Targus cites the statute governing IPR estoppel, 35 U.S.C. § 315(e)(2), as well as the district court's decision in *California Institute of Technology v. Broadcom Ltd.*, No. 16-3714, 2019 WL 8807748 (C.D. Cal. July 1, 2019) ("*Caltech*"), *aff'd*, 25 F.4th 976 (Fed. Cir. 2022).  In the *Caltech* case, the defendants raised two prior art references in an IPR proceeding, making the same argument they made in district court with respect to invalidity.  *Caltech*, 2019 WL 8807748, at *6.  Because the Board "rejected" the defendants' arguments about the teachings of the two prior art references, the district court held "as a matter of law" that those references "were not but-for material to the patentability of the asserted claims that were reviewed against these references during IPR."  *Id.*

In this case, unlike in the *Caltech* case, the Board's findings in the IPR proceeding regarding the '578 patent do not have an estoppel effect on Victorinox.  Although Victorinox is estopped from making certain invalidity arguments under the court's order at Dkt. No. 199, and by extension under 35 U.S.C. § 315(e)(2), that estoppel does not apply to an inequitable conduct claim.  *See Milwaukee Elec.*, 271 F. Supp. 3d at 1030.  And Victorinox would not be barred as a matter of collateral estoppel from litigating issues such as whether the TSA RFI discloses certain limitations of the asserted claims, because Victorinox was not a party to the IPR proceeding.  *See Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (setting forth

38

the elements of collateral estoppel, including that "the party being precluded was fully represented in the prior action" (citation omitted)).

To be sure, even absent an estoppel effect, the Board's finding in the IPR proceeding that the asserted claims were not unpatentable over the TSA RFI is strong evidence that the TSA RFI is not but-for material to patentability. However, three considerations lead me to conclude that the Board's findings in this instance do not compel the conclusion that the TSA RFI is not material as a matter of law. First, Victorinox was not a party to the IPR proceeding, and its arguments regarding the disclosures of the TSA RFI may differ from the arguments made by the petitioner in that proceeding. *See* Dkt. No. 261 at 15 (suggesting that the IPR decision "does not address" certain arguments that Victorinox would presumably make in this case); *cf. Caltech*, 2019 WL 8807748, at *6 (noting that the defendants had used the asserted prior art references in the district court proceedings "for the same purpose" as the defendants used the references during the IPR proceedings). Second, the IPR decision is currently on appeal, which leaves open the possibility that the Board's findings may be vacated or overturned. Third, the Federal Circuit has instructed courts to exercise "caution" in granting summary judgment on the issue of inequitable conduct. *M. Eagles*, 439 F.3d at 1340.

For those reasons, I will not grant summary judgment that the TSA RFI is not material prior art for purposes of Victorinox's claim of inequitable conduct. However, in light of pertinent evidence introduced at trial, it may be necessary to revisit this issue in advance of a bench trial on inequitable conduct, should one occur in this case.

### 2.  *Intent to Deceive*

Targus next argues that there is no evidence that Targus intended to deceive the PTO by failing to disclose either the TSA RFI or the Targus Legacy Bags. With respect to both items of

prior art, Targus asserts that Victorinox has failed to show evidence of a "deliberate decision to withhold a reference," which is required to establish inequitable conduct. Dkt. No. 271 at 11; *see also id.* at 7.

    *i.*    *TSA RFI*

With respect to the TSA RFI, Victorinox has pointed to evidence that could support a conclusion that the inventors and the attorney who prosecuted the '578 patent, John Thompson, knew of the TSA RFI and its materiality prior to the issuance of the '578 patent. On March 4, 2008, Mr. deBlois sent an email to several individuals, including Mr. Cuong and Mr. Gormick, that included the TSA RFI and Mr. deBlois' suggestions for responding to the RFI. Dkt. No. 262-1, Exh. 39. Earlier that day, Dr. Miller forwarded the TSA RFI to the third named inventor of the '578 patent, Bob Shortt. *Id.* Also on March 4, Mr. Gormick suggested to Mr. Shortt that Targus consider "submitting design patents as soon as we have concepts and prior to submitting to the TSA," as well as "com[ing] up with some sort of IP around the utility of the case and protect it in that manner." Dkt. No. 245-2, Exh. 39. Then, on March 14, 2008, the day after the priority date of the '578 patent, Mr. Gormick noted that "[w]e are unclear what our patent position will be if we develop potentially patentable intellectual property with the TSA[.]" Dkt. No. 262-1, Exh. 56. The above evidence would permit a reasonable factfinder to find that Messrs. Gormick, Cuong, and Shortt knew of the TSA RFI and considered the TSA's disclosures in the RFI to be material to patentability.

For Mr. Thompson's part, it is true that he testified in a deposition that he was not aware of the TSA RFI prior to the issuance of the '578 patent. *Id.*, Exh. 57, at 23:2–12. However, on May 6, 2008, Mr. Gormick sent Mr. Thompson and another attorney an email that included as an attachment Targus's submission to the TSA responding to the RFI. *Id.*, Exh. 46. That attachment

discussed, among other things, how the concepts disclosed in the document "meet[] the criteria of [the] RFI." *Id.* The same day, Mr. Gormick sent Mr. Thompson another email, which included a request for prototypes based on Targus's "white paper submission in response to [the TSA RFI]." *Id.*, Exh. 47. And during prosecution, Mr. Thompson argued on behalf of Targus that certain features that appear to have been disclosed in the TSA RFI were not present in the prior art. *See, e.g.*, Dkt. No. 172, Exh. C at 25 ("[The reference] is not concerned with isolating a computer to facilitate scanning . . . ."); *id.* at 32 (prior art reference disclosed "additional components [that] provide obstructions to scanning a computer in a storage section"). Based on that evidence, a reasonable factfinder could conclude that Mr. Thompson knew of the TSA RFI and that the RFI was material to patentability.

To be sure, the Federal Circuit has held that "[k]nowledge of the reference and knowledge of materiality alone are insufficient after *Therasense* to show an intent to deceive." *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1374 (Fed. Cir. 2012). In the *1st Media* case, the court of appeals reversed a district court's finding of inequitable conduct after a bench trial because the record did not support the inference that the prosecuting attorneys deliberately chose to withhold a material prior art reference. *Id.* at 1375. And it is true that Victorinox has pointed to no affirmative evidence that the inventors or Mr. Thompson deliberately chose to withhold the TSA RFI.

That point, however, does not compel a determination of no inequitable conduct at the summary judgment stage of this case. As the Federal Circuit explained in *M. Eagles*, "[i]ntent is generally inferred from the facts and circumstances surrounding the applicant's overall conduct, especially when there is no good faith explanation for a nondisclosure." 439 F.3d at 1341. Such an inference frequently requires the court to make credibility determinations regarding the

41

testimony of the witnesses.  *See, e.g.*, *Belcher Pharms., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1352 (Fed. Cir. 2021) (affirming district court's finding of inequitable conduct where the district court found the inventor's testimony "raised serious questions as to his credibility"); *Luv n' care v. Laurain*, 606 F. Supp. 3d 337, 364 (W.D. La. 2022) ("Courts may consider lack of credibility in deciding whether there is an intent to deceive the USPTO.").  As multiple courts have observed, questions of intent and credibility are "difficult to determine on summary judgment."  *Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15-cv-478, 2017 WL 11455318, at *2 (E.D. Va. Apr. 13, 2017); *Mitsubishi Heavy Indus., Ltd. v. Gen. Elec. Co.*, No. 6:10-cv-812-ORL-28, 2012 WL 4336208, at *4 (M.D. Fla. Sept. 21, 2012) ("[The defendant] will face a tough task in meeting the 'single most reasonable inference' standard set forth in *Therasense*, but because credibility may be crucial this question cannot be determined on summary judgment."); *see also M. Eagles*, 439 F.3d at 1340 (The Federal Circuit "'urges caution' in making an inequitable conduct determination at the summary judgment stage." (citation omitted)).  Therefore, summary judgment will not be granted to Targus on the issue of inequitable conduct with respect to the TSA RFI.

> ii.   *Targus Legacy Bags*

With respect to the Targus Legacy Bags, Victorinox alleges that only the named inventors, and not Mr. Thompson, had an intent to deceive the PTO by failing to disclose those bags.[9]  Dkt. No. 172 ¶ 69.  There is evidence in the record that would support a conclusion that the inventors knew of the existence of the TSA Legacy Bags.  For example, in September 2007 Mr. Gormick emailed himself a spreadsheet containing a list of product numbers, including the CDB1 and CCB1 bags.  Dkt. No. 262-1, Exhs. 42, 60.  In March 2007, Mr. Shortt similarly sent himself a spreadsheet

---

[9]  The "Targus Legacy Bags" include the products with model numbers "CCB1," "CDB1," and "CFP3."  Dkt. No. 172 ¶ 50.

containing a list of product numbers, including the CDB1 bag. *Id.*, Exhs. 43, 61.  And in March 2008, Mr. Cuong received an email that included an attachment referring to the CDB1 bag. *Id.*, Exh. 44.

Victorinox points to no evidence, however, that would support a conclusion that the named inventors knew the Targus Legacy Bags were material to patentability.  The only evidence that Victorinox proffers on that score is an email in which Keith Braesch, who held the title of "Vice President, Commercial Solutions" at Targus, suggested that a Targus bag known as the "OCN1" bag is "already TSA compliant" and that Targus should market the bag as such.  Dkt. No. 262-1, Exh. 62.  But Victorinox points to no evidence that the named inventors ever saw that email (which was not addressed to any of them), and Victorinox does not assert that the OCN1 bag is material prior art that was not disclosed to the PTO.  For those reasons, the email from Mr. Braesch is entitled to no weight in the determination of inequitable conduct.

In light of the absence of any evidence that the named inventors viewed the Targus Legacy Bags as material to patentability, no reasonable factfinder could conclude, from the evidence in the summary judgment record, that the inventors engaged in inequitable conduct by failing to disclose those bags to the PTO.  Accordingly, summary judgment will be granted to Targus of no inequitable conduct based on the Targus Legacy Bags.

### C.   Simultaneous Invention

Targus next moves for summary judgment on the issue of simultaneous invention, arguing that the court should preclude Victorinox from offering evidence that certain products manufactured by Targus's competitors were invented independently and simultaneously with the '578 patent.

Victorinox's argument on this issue is that Targus's competitors developed bags having features akin to those claimed in the '578 patent simultaneously with and independently of Targus, and that the evidence of such simultaneous invention is probative of obviousness under 35 U.S.C. § 103. Dkt. No. 261 at 24. Targus responds that the features of the bags produced by Targus's competitors were not "independently developed," and that the evidence of simultaneous invention therefore does not support Victorinox's obviousness defense. Dkt. No. 244 at 24 (citing *Shire Orphan Therapies LLC v. Fresenius Kabi USA, LLC*, No. 15-1102, 2018 WL 2684097, at *20–21 (D. Del. June 5, 2018)).

The core argument underlying Targus's motion on this point is that Targus's competitors developed their products in response to the TSA RFI, which was in turn a disclosure of "the Targus inventors' ideas." *Id.* at 25. For that reason, Targus argues, the competitors' inventions cannot be viewed as independent of Targus's conception and reduction to practice of the invention of the '578 patent. *Id.* at 25–26.

The problem for Targus is that I have found that a reasonable factfinder could conclude that the TSA developed its RFI independently or in consultation with entities other than Targus and Innovation Focus. If a factfinder were to conclude that the TSA RFI was not a disclosure of the Targus inventors' ideas, then a factfinder could by extension conclude that the competitors developed their products independently of Targus. For that reason, summary judgment will not be granted to Targus on the issue of simultaneous invention.[10]

_____

[10] Victorinox argues that Targus's request for summary judgment on this issue is improper under Federal Rule of Civil Procedure 56. In Victorinox's view, "the existence of one or more 'secondary considerations' [of obviousness] . . . is not properly addressed on summary judgment." Dkt. No. 261 at 24. That argument is unpersuasive. By its terms, Rule 56 permits litigants to seek summary judgment on "claim[s] or defense[s]," including "part[s] of each claim or defense." Fed. R. Civ. P. 56(a). Secondary considerations of obviousness are unquestionably "part" of a claim of invalidity. *See id.* Indeed, courts have granted summary judgment that a secondary consideration

### D.    Testimony of Ms. Riley

Targus next moves to preclude the testimony of Victorinox's damages expert, Michele Riley, under *Daubert* and Federal Rule of Evidence 702.  Targus argues that there are three grounds on which the court should preclude Ms. Riley's testimony:  (1) Ms. Riley failed to assume infringement and validity as required for a hypothetical negotiation; (2) Ms. Riley improperly applied a downward adjustment to the royalty rate due to Victorinox's brand strength; and (3) Ms. Riley improperly treated TSA PreCheck as a non-infringing alternative.

#### 1.   *Assumption of Infringement and Validity*

Targus first argues that Ms. Riley failed to apply the assumption of infringement and validity that generally applies to the hypothetical negotiation approach for determining a reasonable royalty.    As  the  Federal  Circuit  has  explained,  "[t]he  hypothetical negotiation . . . assumes that the asserted patent claims are valid and infringed."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009).

In her report, Ms. Riley relied on five settlement agreements from lawsuits in which Targus asserted the '578 patent to establish the royalty rate.  Dkt. No. 249-18 ¶ 153.  After applying the frequently invoked *Georgia-Pacific* factors for analyzing a hypothetical negotiation, Ms. Riley concluded that the appropriate royalty rate for the hypothetical negotiation was [REDACTED] percent, the "mid-point" of the range of rates from the five settlement agreements.  *Id.* ¶ 208.  Ms.

---

relevant to obviousness is not present when there was insufficient evidence to support a finding that such a consideration was present.  *See, e.g.*, *Est. of Stoller v. Ford Motor Co.*, 784 F. Supp. 506, 520 (N.D. Ill. 1992) (finding no genuine issue of material fact on the secondary considerations of commercial success, copying, and long felt need); *NetAirus Techs., LLC v. Apple, Inc.*, No. 10-cv-3257, 2012 WL 12884837, at *14 (C.D. Cal. Feb. 27, 2012) (holding, at summary judgment, that the plaintiff could not "rely on the commercial success of the [accused product] as a secondary indication of non-obviousness").  Had Targus established that there was no genuine dispute of material fact on the issue of simultaneous invention, it would have been entitled to summary judgment on that secondary consideration of obviousness.

Riley noted, however, that her proposed [REDACTED] percent royalty rate "does not account for the fact that under the [settlement agreements], validity and infringement were disputed." *Id.* ¶ 209. Thus, she explained, "[a]n upward adjustment to th[e] [REDACTED] royalty rate may be warranted" to account for the assumption of infringement and validity, and as a consequence the "appropriate royalty rate" could be as high as [REDACTED] percent. *Id.* Ms. Riley then proposed that the reasonable royalty award in this case would be "no more than [REDACTED]," based on her [REDACTED] percent royalty rate. *Id.* ¶ 210.

The core of Targus's argument for exclusion on this ground is essentially that "Ms. Riley never uses the [REDACTED] royalty rate for any damages calculations." Dkt. No. 244 at 27. It is true that Ms. Riley never expressly calculated a proposed damages award based on a [REDACTED] percent royalty rate. However, Ms. Riley clearly understood that infringement and validity were assumed in the hypothetical negotiation, and even suggested that the royalty rate could be increased to as high as [REDACTED] percent to account for that assumption. *See* Dkt. No. 249-18 ¶ 209. Given that Ms. Riley also articulated the various royalty bases to which the royalty rate could be applied, *id.* ¶¶ 122–23, it would be a trivial matter for the jury to calculate the award of damages based on a [REDACTED] percent royalty rate if it concluded that such a rate was supported by the record. As the Federal Circuit has explained, the record may support "a range of reasonable royalties, rather than a single value," because "estimating a reasonable royalty is not an exact science." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). I will therefore not exclude Ms. Riley's testimony for failing to apply the required assumption that the asserted claims are valid and infringed as part of the hypothetical negotiation calculus.

## 2. *Brand Strength*

Targus next argues that Ms. Riley improperly applied a downward adjustment to her proposed royalty rate based on the alleged "brand strength" of Victorinox.  Dkt. No. 244 at 28–31.  In her report, Ms. Riley offered the opinion that "Victorinox would have been able to drive down the royalty rate . . . from the high of [REDACTED] by leveraging the fact that its brand would still be an important driver of the sales of backpacks and briefcases with checkpoint-friendly features."  Dkt. No. 249-18 ¶ 206.  She added that "the companies with the highest accused sales under the [settlement agreements] paid the lowest implied royalty rates."  *Id.*

Targus argues that it was "illogical" for Ms. Riley to adjust the royalty rate downward due to Victorinox's brand strength, because she did not consider "the extent to which [the] prior licensees' brand strength contributed to the royalty rate in th[e] reference settlement agreements."  Dkt. No. 244 at 29.  Two aspects of Ms. Riley's report, however, provide support for her conclusion that a downward adjustment was warranted.  First, she cited an email from a product manager at Targus who appeared to perceive Victorinox's brand strength as a unique challenge to Targus.  Dkt. No. 249-18 ¶ 160 ("I don't care how hard we try and how great of a case we develop, we will never have the Swiss logo [i.e., Victorinox's trademark, a silver or white cross on a red field, as in the flag of Switzerland].  There are some brands that develop a consumer following that is so strong that is it not economically feasible to convert them. . . .  The consumer who bought [a case] because it is Swiss will always prefer the Swiss.") (quoting Dkt. No. 262-1, Exh. 55).  Second, she noted that the settlement agreements with lower royalty rates were with "the companies with the highest accused sales."  *Id.* ¶ 206.  Given those observations, it was not necessary for Ms. Riley to make an express comparison between Victorinox and the five accused infringers in the prior lawsuits in order to support her downward adjustment to the royalty rate.

Based on the above considerations, I find that that Victorinox has made a preponderant showing that Ms. Riley's downward adjustment to the royalty rate is the product of a reliable application of the relevant principles and methods and thus her testimony on that score will not be excluded. Of course, Targus remains free to raise its concerns with Ms. Riley's methodology on cross-examination if it elects to do so.

### 3. *Non-Infringing Alternatives*

Under the seminal case on lost profits, *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, a patentee must prove the following to recover lost profits: (1) "demand for the patented product"; (2) "absence of acceptable noninfringing substitutes"; (3) the patentee's "manufacturing and marketing capability to exploit the demand"; and (4) "the amount of profit [the patentee] would have made." 575 F.2d 1152, 1156 (6th Cir. 1978). In her report, Ms. Riley contended that Targus has failed to satisfy the second factor in *Panduit* because in her opinion the TSA PreCheck service constitutes an acceptable non-infringing alternative to Targus's patented bags.

TSA PreCheck is an expedited screening service offered by the TSA; passengers who enroll in TSA PreCheck by qualifying and paying a fee are permitted to complete the security screening process without removing their laptops from their bags, among other conveniences. Dkt. No. 249-18 ¶ 64. In her report, Ms. Riley expressed the opinion that the availability of TSA PreCheck means that many customers could "simply cho[ose] not to purchase any backpack or briefcase with checkpoint-friendly features and instead opt[] to become PreCheck members who have no need for checkpoint-friendly products." *Id.* ¶ 65. Viewing TSA PreCheck as an "acceptable[] non-infringing alternative," Ms. Riley offered the opinion that Targus's damages expert, Mr. Tregillis, has failed to establish the absence of an acceptable non-infringing alternative. *Id.* ¶¶ 64, 75. Ms. Riley also explained that the availability of TSA PreCheck would have driven

down the royalty rate in a hypothetical negotiation because "checkpoint-friendly features would not warrant charging high enough prices to cover the cost of the licensee fee and still make a reasonable profit." *Id.* ¶ 206.

Targus argues that Ms. Riley's testimony on the non-infringing alternative issue would not be helpful to the trier of fact. Dkt. No. 244 at 31–32. Targus's argument is essentially that TSA PreCheck is so dissimilar from the patented products that it cannot plausibly be deemed a non-infringing alternative. As Targus explains in its brief, "Targus's patented products are laptop cases and computer backpacks," whereas "TSA PreCheck is but an expedited screening service offered in airports." Dkt. No. 244 at 31. Targus adds that the TSA "does not provide laptop computer bags as part of its PreCheck service." *Id.*

In the context of a lost profits analysis, the Federal Circuit has explained that consideration of non-infringing alternatives is designed to "take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed." *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1350–51 (Fed. Cir. 1999). The court in *Grain Processing* added that "[t]he competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with the patent, if it can compete in some other lawful manner." *Id.* at 1351. Thus, the lost profits inquiry must "compar[e] the patented invention to its next-best available alternatives." *Id.*

In light of that focus in the lost profits setting, it is clear that an acceptable non-infringing alternative would be a laptop bag or briefcase of some sort—perhaps even a checkpoint-friendly backpack—that does not satisfy every limitation of the asserted claims. The patented bags almost certainly provide advantages beyond being checkpoint-friendly. For example, they may allow for easy storage of a person's belongings, among other things. A non-infringing alternative would

49

need to provide those advantages to the consumer as well.  *See Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991) ("A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages.").

In that context, the assertion that TSA PreCheck is an acceptable non-infringing alternative to Targus's patented bags is not plausible.  By Ms. Riley's reasoning, a traveler could also obtain the asserted benefit of a checkpoint-friendly bag (i.e., not needing to remove a laptop from the bag during security) by flying on a private plane where security screening is not required, or by taking a bus or train instead of flying.  Those alternatives would not reasonably play a role in the lost profits analysis, which seeks to reconstruct the market for the patented products "as it would have developed absent the infringing product."  *Grain Processing*, 185 F.3d at 1350.  Ms. Riley's opinion that TSA PreCheck is a non-infringing alternative for purposes of the second factor in *Panduit* will therefore be excluded.

I will not, however, exclude Ms. Riley's opinion that the availability of TSA PreCheck would have driven down the royalty rate in the hypothetical negotiation.  Her opinion on that score is essentially that demand for the patented technology would have been reduced as the use of TSA PreCheck became more prevalent, thus applying downward pressure on the royalty rate that Victorinox would have agreed to in order to obtain a license to the '578 patent.  Unlike in the consideration of the non-infringing alternative component of the lost profits analysis, that opinion is an appropriate consideration in determining a reasonable royalty by assessing what an infringer would have paid the patentee in a hypothetical negotiation for a license to the asserted patent.  *See Lucent*, 580 F.3d at 1324 (The hypothetical negotiation approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just

before infringement began."); *see also AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) (lost profits damages "seek[] to compensate the patentee . . . for lost sales caused by the infringement," whereas reasonable royalty damages seek to approximate what "the infringer would have been willing to pay [for a license] if it had been barred from infringing").

Accordingly, Targus's motion is granted to the extent that Ms. Riley will not be allowed to testify that TSA PreCheck is a non-infringing alternative for purposes of a lost profits analysis. But Targus's motion will be denied to the extent that it seeks to bar Ms. Riley from testifying as to the effect the availability of TSA PreCheck would have on the determination of a reasonable royalty.

### E.    Testimony of Mr. Poulson

Targus moves to preclude the testimony of Mr. Poulson on the ground that he applied an incorrect legal standard in his report when discussing the issues of conception, diligence, and reduction to practice. Specifically, Targus objects to Mr. Poulson's statement in his opening report that "the party asserting that a claim is entitled to an earlier priority date bears the burden of proof." Dkt. No. 245-1, Exh. 15 ¶ 112. Victorinox argues that even though that statement may be incorrect, Mr. Poulson's analysis does not reflect an improper application of the burden of proof with respect to conception, diligence, and reduction to practice. Dkt. No. 261 at 34–35.

As an initial matter, it is well settled that the patent challenger bears the burden of proof on the issues of conception, diligence, and reduction to practice. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1328 (Fed. Cir. 2008) (holding that the burden of persuasion "to convince the court that [the patentee] is not entitled to the benefit of [an] earlier filing date" lies with the patent challenger); *Endo Pharms. Inc. v. Actavis Inc.*, No. 14-1381, 2017 WL 3731001, at *3–4 (D. Del. Aug. 30, 2017), *aff'd sub nom. Endo Pharms. Inc. v. Actavis LLC*, 922 F.3d 1365 (Fed. Cir. 2019)

(rejecting the argument that "it is the Plaintiffs' burden to provide [an] earlier priority date"). The patentee does have a burden of production, however, that requires the patentee to introduce evidence corroborating the inventor's testimony on issues of conception and diligence. *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 967 (Fed. Cir. 2014). Victorinox argues that the statement in Mr. Poulson's report was intended to convey that Targus bears the burden of production, rather than the burden of proof, on those issues. Dkt. No. 261 at 34–35.

During Mr. Poulson's deposition, counsel for Targus asked him about the burden of proof that he articulated in his report. Mr. Poulson again stated the burden of proof incorrectly, noting that "[i]t's my understanding that Targus would be responsible to show the burden of proof." Dkt. No. 245-1, Exh. 11, at 88:14–89:3. However, when asked whether he based his validity opinions on his "understanding that Targus bears the burden of proof on priority dates," he answered that he did not. *Id.* at 90:5–9. He added that he was not sure that the burden of proof "was something [he] was actually thinking about at the time, to be fair." *Id.* at 90:22–91:8.

In his reply report, Mr. Poulson expressed the opinion that "[b]ased on [his] review of the documents and testimony that [Mr.] Wada cited, Targus did not conceive of the claims of the '578 Patent before the TSA published the RFI." Dkt. No. 245-2, Exh. 19 ¶ 20. Mr. Poulson added that "[e]ven if Targus had conceived of the claims of the '578 Patent before the TSA published the RFI, Targus did not reduce them to practice until at least May 15, 2008 [for some claims] . . . and December 2008 [for another claim]." *Id.* He further stated that "Targus has not demonstrated diligence for the period just prior to the TSA's publication of the RFI, and did not demonstrate diligence after April 7, 2008." *Id.* In the 82 paragraphs that followed, Mr. Poulson elaborated on those opinions in detail. *See id.* ¶¶ 21–103.

I have reviewed the details of Mr. Poulson's reply report, and I find it sufficiently clear that Mr. Poulson's opinions did not turn on the burden of proof that is applied with respect to the issues of conception, diligence, and reduction to practice.  Rather, he essentially expressed the opinion that Targus did not conceive of the invention of the '578 patent, nor was it diligent, prior to the publication of the TSA RFI.  That opinion, he repeatedly stated, is based on his own review of the evidence and testimony that was made available to him.  *See, e.g.*, *id.* ¶¶ 20, 24, 27, 70, 91, 98, 101.

At various points in his report, Mr. Poulson also noted that Mr. Wada, Targus's expert, did not identify "any evidence" of particular aspects of the inventors' conception and diligence.  *See, e.g.*, *id.* ¶¶ 31, 69, 97.  Those observations are consistent with an application of the correct legal standard, i.e., that Targus bears the burden of production to corroborate the inventors' testimony regarding diligence.  *See Allergan*, 754 F.3d at 967.

During the oral argument, I asked Targus to identify the clearest indication in Mr. Poulson's report that his opinion was in fact based on the burden of proof that he articulated in paragraph 112 of his opening report.  Targus pointed me to paragraph 20 of Mr. Poulson's reply report.  That paragraph states, in its entirety:

> In this section, I respond to Wada's opinions regarding the alleged invention of the '578 Patent in paragraphs 32-57 of Wada's report. Based on my review of the documents and testimony that Wada cited, Targus did not conceive of the claims of the '578 Patent before the TSA published the RFI. Even if Targus had conceived of the claims of the '578 Patent before the TSA published the RFI, Targus did not reduce them to practice until at least May 15, 2008 for claims 1, 2, 17, and 42, but even then at least one limitation was missing, and December 2008 for claim 44. Targus has not demonstrated diligence for the period just prior to the TSA's publication of the RFI, and did not demonstrate diligence after April 7, 2008. Accordingly, the TSA RFI is prior art to the claims of the '578 Patent.

Dkt. No. 245-2, Exh. 19 ¶ 20.  In essence, Targus relies on the statement in the second to last sentence that "Targus has not demonstrated diligence." *Id.*  Although that statement might suggest

that Mr. Poulson was basing his opinion on the burden of proof, the weight of the summary judgment record leads me to conclude that his opinion was simply that Targus did not conceive of the asserted claims prior to the publication of the TSA RFI and that Targus was not diligent, regardless of the burden of proof that applies.

The two cases cited by Targus on this issue are distinguishable from this case.  In *AAMP of Florida, Inc. v. Automotive Data Solutions, Inc.*, the defendant's expert offered the opinion that the asserted claims were invalid for inadequate written description.  No. 8:13-cv-2019, 2015 WL 12843845, at *8 (M.D. Fla. Oct. 8, 2015).  His opinion was based on the incorrect assertion that "every claim element needs to be expressly disclosed in the patent specification." *Id.* at *9.  The court excluded the expert's opinion, noting that the expert "neglected to apply, or even consider, the factors identified by the Federal Circuit" for determining whether the written description requirement is met. *Id.*  In other words, the court held that the expert's opinion was "based on an incorrect legal standard." *Id.*

In *Intuitive Surgical, Inc. v. Auris Health, Inc.*, the defendant's expert offered the opinion that infringement had not been established because no single person performed every step of the asserted method claim.  549 F. Supp. 3d 362, 370–71 (D. Del. 2021).  Explaining that the law allows for divided direct infringement, i.e., infringement in which "all steps of a claimed method are performed by *or attributable to* a single entity," the court excluded the expert's opinion to the extent that the opinion foreclosed a theory of divided infringement. *Id.*

In both cases, the court excluded the experts' opinions to the extent that they were actually based on an incorrect application of the relevant legal standards.  In this case, although Mr. Poulson misstated the burden of proof in his opening report and in his deposition, I am not persuaded that Mr. Poulson's opinions were ultimately dependent on the burden of proof and therefore that his

opinions reflect an improper application of the legal standard.  Mr. Poulson's opinions will therefore not be excluded based on his erroneous statement of the burden of proof.  Targus remains free to raise its concerns regarding Mr. Poulson's report on cross-examination, as those concerns are relevant to the weight of Mr. Poulson's testimony.

## V.    <u>Conclusion</u>

Victorinox's motion for summary judgment is GRANTED with respect to the Sierra Slimcase, Legacy 17" Slimcase, Skywalk Flyer, Algorithm, Algorithm USB, Odyssey Pro-Check, and Legacy 16" Double Gusset bags and is DENIED in all other respects.  Victorinox's motions to preclude expert testimony are also DENIED.  Targus's motion for summary judgment as to inequitable conduct is GRANTED with respect to the Targus Legacy Bags and is DENIED in all other respects.  Targus's motion to preclude the testimony of Ms. Riley is GRANTED IN PART and DENIED IN PART, and the motion to preclude the testimony of Mr. Poulson is DENIED.

In an abundance of caution, this order has been filed under seal because many of the parties' submissions regarding the present motions were filed under seal.  Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal.  Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 27th day of March, 2023.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE